# Exhibit 1

<table>
<tr><td colspan="2">

**DISTRICT COURT, EAGLE COUNTY, COLORADO**
Court Address:      885 Chambers Ave.
                         Eagle, CO 81631

</td></tr>
</table>

DATE FILED: September 2, 2020 4:08 PM
FILING ID: BE64B50022B3D
CASE NUMBER: 2020CV30190

**Plaintiff:**
BBG HOLDING CORP., a Colorado Corporation

v.

**Defendants:**
K CAPITAL, LLC, a Minnesota Limited Liability
Company; MIKHAIL G. KRAMINSKI, an individual.

▲ COURT USE ONLY ▲

Case Number:

Div.:

| Attorney for Plaintiff BBG Holding Corp.: | |
|---|---|
| Name: | Buck Beltzer, #37804 |
| | Alex King, #54093 |
| Address: | BELTZER BANGERT & GUNNELL LLP |
| | 7900 E. Union Ave. Suite 920 |
| | Denver, CO 80237 |
| Telephone: | (720) 576-7225 |
| E-mail: | buck@bbglaw.com |
| | alex@bbglaw.com |

## COMPLAINT

BBG Holding Corp. ("BBGHC") states as follows for its Complaint against K Capital, LLC ("K Capital") and Mikhail G. Kraminski:

## PARTIES, JURISDICTION, AND VENUE

1.     BBGHC is a Colorado corporation doing business in Colorado as a real estate holding company.  BBGHC's principal place of business is 77 Metcalf Road, Avon, CO 81620.

2.     K Capital is a Minnesota limited liability company in good standing with the Minnesota Secretary of State. K Capital is not licensed to conduct business in Colorado. K Capital's principal place of business is 229 Minnetonka Avenue South No. 369, Wayzata, MN 55391.

3.     Mikhail G. Kraminski is the Manager of K Capital.

4.     On information and belief, Mr. Kraminski's address is 229 Minnetonka Avenue South No. 369, Wayzata, MN 55391.

5.     The Court has jurisdiction over BBGHC and K Capital because this action arises from a purchase and sale agreement ("PSA") between BBGHC and K Capital for property located in Avon, Colorado executed on February 6, 2020. A true and correct copy of the PSA is attached as **Exhibit 1** and incorporated by reference.

6.     The Court has personal jurisdiction over Mr. Kraminski in accordance with the due process clause of the United States Constitution and pursuant to Colorado's long-arm statute, Colo. Rev. Stat. § 13-1-124(1)(a) and (b), because Mr. Kraminski's wrongful conduct arises from his business transactions within the State of Colorado and because he committed tortious acts within the State of Colorado. Mr. Kraminski has availed himself to the jurisdiction of this Court by writing, signing and sending a check to BBGHC in Colorado despite issuing a stop payment directive on that check, which falsely represented an intent to purchase Property in Colorado, and prevented BBGHC from selling the Property to any other purchaser. The exercise of personal jurisdiction over Mr. Kraminski does not offend traditional notions of fair play and substantial justice.

7.     Venue is proper in this Court because the PSA specifies venue in any state or federal court located in Colorado.

8.     Venue is also proper in this Court pursuant to C.R.C.P. 98 because this case affects real property located in Eagle County, Colorado.

## GENERAL ALLEGATIONS

9.     BBGHC is the owner of a certain parcel of land located in the Town of Avon, Eagle County, Colorado with a street address of 77 Metcalf Road (the "Property").

10.     The legal description for the Property is Lot 22, Block 1, according to the Official Plat – Town of Avon and Final Subdivision Plat, Amendment No. 4, Benchmark at Beaver Creek, County of Eagle, State of Colorado.

11.     BBGHC listed the Property for sale on September 12, 2019 through its brokerage firm, Kanai Capital Advisors.

12.     On January 6, 2020, K Capital submitted a letter of intent to purchase the Property (the "Letter of Intent") through its brokerage firm, Mountain Commercial Advisors, LLC d/b/a NAI Mountain Commercial. A true and correct copy of the Letter of Intent is attached as **Exhibit 2** and incorporated by reference.

13.     The Letter of Intent was signed by Mr. Kraminski as the chief manager of K Capital.

14.     The PSA, executed on February 6, 2020, is a valid and enforceable contract.

-2-

15.     The Parties agreed in Section 2.1 of the PSA that K Capital would pay $3,300,000 for the Property.

16.     In order to prevent BBGHC from selling the Property to a different purchaser, under the Section 2.1.1 of the PSA, K Capital was obligated to deposit $25,000 as earnest money with Title Company of the Rockies (the "Title Company"), the transaction's escrow agent.

17.     The deadline for K Capital to deposit the $25,000 earnest money was February 13, 2020.

18.     On February 14, 2020 the Title Company issued BBGHC an earnest money receipt which stated the Title Company had received Check 6135 from K Capital in the amount of $25,000 as earnest money to purchase the Property. A true and correct copy of the earnest money receipt is attached as **Exhibit 3**.

19.     Additionally, to prevent BBGHC from selling the Property to a different purchaser, K Capital was obligated in Section 2.1.2 of the PSA to deposit an additional $75,000 as additional earnest money. The deadline for K Capital to deposit the $75,000 additional earnest money was March 16, 2020.

20.     In total, K Capital was obligated to deposit on or before March 16th a total amount of $100,000 as earnest money in order to prevent BBGHC from selling the Property to a different purchaser.

21.     K Capital's act of sending the check to the Title Company constituted sufficient consideration to make the PSA valid and enforceable.

22.     On March 3, 2020 the Title Company informed BBGHC that the $25,000 earnest money check sent by K Capital was rejected by its bank for insufficient funds and the Title Company had requested a replacement cashier's check from K Capital.

23.     On information and belief, K Capital, through its manager Mr. Kraminski, asked its bank to stop payment on the earnest money check shortly after writing the check.

24.     After receiving notice that the $25,000 earnest money check had been rejected for insufficient funds, K Capital, through Mr. Kraminski, reassured BBGHC over the phone that it still intended to purchase the Property and promised it would re-deposit the $25,000 earnest money.

25.     K Capital has not sent a replacement cashier's check for rejected Check 6135. K Capital has not deposited the $75,000 additional earnest money. In fact, the Title Company has not received any of the money K Capital was obligated to deposit under Section 2.1 of the PSA.

26.     On March 17, 2020 BBGHC provided K Capital with written notice that it was in default of the PSA and demanded that K Capital deposit $100,000 as earnest money. A true and correct copy of the written notice is attached as **Exhibit 4**.

27.     K Capital's failure to deposit the earnest money is a material default of an obligation under the PSA.

28.     Section 7.2 of the PSA includes a valid and enforceable liquidated damages provision.

29.     Under Section 7.2 of the PSA, BBGHC is entitled to the $100,000 earnest money amount as liquidated damages as a result of its material default.

30.     Section 9.9 of the PSA allows the prevailing party in any dispute to recover its reasonable attorneys' fees and expenses.

## First Claim for Relief
### (Breach of Contract – Against Defendant K Capital, LLC)

31.     BBGHC incorporates by reference the foregoing paragraphs as though set forth in full herein.

32.     The PSA is a valid and enforceable contract.

33.     K Capital materially breached the PSA by failing to deposit the earnest money.

34.     BBGHC substantially performed its obligations and satisfied all conditions precedent under the PSA.

35.     K Capital's material breach of the PSA caused damages to BBGHC.

36.     The parties agreed in Section 7.2 of the PSA that in the event of a material breach of the PSA by K Capital, the actual damages incurred by BBGHC would be extremely difficult to calculate. Therefore, BBGHC is entitled to the $100,000 earnest money amount as liquidated damages stemming from K Capital's breach of the PSA.

37.     Additionally, K Capital wished to limit its liability for any material breach of the PSA to the $100,000 earnest money amount.

38.     As a result of K Capital's material breach of the PSA, BBGHC is entitled to recover $100,000 in damages from K Capital.

39.     Further, pursuant to Section 9.9 of the PSA, BBGHC is entitled to recover its reasonable attorneys' fees and expenses.

**Second Claim for Relief**
**(Promissory Estoppel – Plead in the Alternative – Against Defendant K Capital, LLC)**

40.     BBGHC incorporates by reference the foregoing paragraphs as though set forth in full herein.

41.     K Capital promised BBGHC it would deposit $100,000 as earnest money in consideration for BBGHC not selling the Property to another purchaser.

42.     K Capital sent a check for $25,000 as earnest money to the Title Company.

43.     After K Capital promised to deposit the earnest money, BBGHC took the Property off the market, thereby preventing the sale of the Property to any other interested purchaser.

44.     BBGHC reasonably and foreseeably relied to its detriment upon the promise made by K Capital.

45.     As a result of BBGHC's reliance, BBGHC refrained from selling the Property in March of 2020. During this same time period, the real estate market where the Property was located significantly cooled because of the impacts of COVID-19.

46.     K Capital's act of stopping payment on the $25,000 earnest money check it sent to the Title Company before it was cashed is the proximate cause for the damages BBGHC has incurred as a result of not selling the Property in March 2020.

47.     Equity entitles BBGHC to recover the damages suffered as a result of its reliance on the promise made by K Capital. The amount of BBGHC's damages will be proven at trial.

**Third Claim for Relief**
**(Fraud – Against both Defendants)**

48.     BBGHC incorporates by reference the foregoing paragraphs as though set forth in full herein.

49.     K Capital and Mr. Kraminski falsely represented they intended to purchase the Property through communications with BBGHC and its brokers. K Capital and Mr. Kraminski affirmed their intention when they wrote and sent the earnest money deposit check to the Title Company in the amount of $25,000. The earnest money deposit prevented BBGHC from selling the Property to anyone other than K Capital.

50.     Specifically, K Capital, speaking through Mr. Kraminski, falsely represented to BBGHC its intention to purchase the Property during communications between the parties prior to execution of the PSA.

51.     K Capital reinforced its intention to purchase the Property through its execution of the PSA.

52.     K Capital, through Mr. Kraminski, also wrote, signed, and sent a check to the Title Company for $25,000 as earnest money to purchase the Property. On February 14, 2020 the Title Company issued an earnest money receipt (Ex. 3) to BBGHC.

53.     When the check was written, K Capital and Mr. Kraminski knew that K Capital no longer intended to purchase the building.

54.     K Capital and Mr. Kraminski wrote the earnest money check with the intent that BBGHC would rely upon the check in its decision not to sell the Property to a different purchaser.

55.     K Capital, through Mr. Kraminski, intentionally stopped payment on the $25,000 check sent to the Title Company before it was cashed. The stop payment directive forced the check to be rejected for insufficient funds when it was presented to the bank by the Title Company. K Capital and Mr. Kraminski issued the stop payment directive because they no longer intended to purchase the Property.

56.     BBGHC relied upon the earnest money receipt (Ex. 3) provided by the Title Company as confirmation of K Capital's intent to purchase the Property and sufficient consideration to make the PSA binding and enforceable.

57.     BBGHC also relied upon the earnest money receipt (Ex. 3) provided by the Title Company in it its decision not the sell the Property to another purchaser.

58.     By writing, signing, and sending a check for $25,000 in accordance with the previously executed PSA, K Capital represented it would pay $25,000 as consideration for BBGHC's agreement not to sell the Property to another purchaser.

59.     When K Capital and Mr. Kraminski wrote the $25,000 check, they had no intention of allowing that check to be cashed. Rather, Mr. Kraminski instructed the bank to issue a stop payment on the check.

60.     On information and belief, when K Capital's own real estate broker questioned this action, Mr. Kraminski responded, "What are they going to do about it?".

61.     K Capital's deceptive actions are compounded by communications between K Capital and BBGHC after the check was rejected, in which K Capital, through Mr. Kraminski,

told BBGHC it still intended to purchase the Property and indicated it would deposit the entire $100,000 earnest money.

62.     At no point was BBGHC aware that K Capital's check would not be honored. Nor was BBGHC aware at any point that Mr. Kraminski's statements that K Capital would purchase the Property were false.

63.     K Capital wrote and sent the $25,000 earnest money check to the Title Company with the intent that BBGHC would rely upon the received check and refrain from terminating the PSA or sell the Property to another purchaser.

64.     BBGHC relied upon K Capital's assurances it wished to continue with the purchase of the Property after K Capital's check was rejected.

65.     BBGHC did not terminate the PSA, nor did it sell the property to another purchaser.

66.     As the direct and proximate result of BBGHC's reliance on K Capital's fraudulent check and fraudulent representations, BBGHC has suffered damages.

67.     Specifically, BBGHC was prevented from receiving the benefit of selling the Property to another purchaser.

68.     As a result, BBGHC was unable to sell the Property in February of 2020. Now the real estate market in Avon, Colorado has been severely impacted by the effects of Covid-19. The Property has significantly decreased in value. The diminution of value of the Property is not speculative, and directly attributable to K Capital and Mr. Kraminski's fraudulent acts and statements.

69.     The injury to BBGHC is the result of fraud, malice or willful and wanton misconduct within the meaning of Colo. Rev. Stat. § 13-21-102(1).

**WHEREFORE,** BBGHC respectfully requests the Court to enter judgment in its favor and against K Capital and Mr. Kraminski as follows:

1.     Judgment against K Capital for its breach of the PSA and an award of damages to which BBGHC is entitled, together with pre- and post-judgment interest, costs, and attorneys' fees; and

2.     In the alternative, judgment in favor of BBGHC and K Capital for Promissory Estoppel;

3.      Judgment against K Capital and Mr. Kraminski for their fraudulent acts and misrepresentations and an award of damages to which BBGHC is entitled, including punitive damages, together with pre- and post-judgment interest, costs, and attorneys' fees; and

4.      For such other and further relief as the Court deems proper under the circumstances.


Dated September 2, 2020.

Respectfully submitted,

*s/ Buck S. Beltzer*_____

Buck S. Beltzer, #37804
Alex King, #54093
BELTZER BANGERT & GUNNELL LLP
7900 E. Union Avenue, Suite 920
Denver, Colorado 80237
Phone: (720) 576-7225
Email: buck@bbglaw.com
           alex@bbglaw.com


**ATTORNEY FOR PLAINTIFF BBG HOLDING CORP.**


**PLAINTIFF ADDRESS:**
77 Metcalf Road
Avon, CO 81620

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

# PURCHASE AND SALE AGREEMENT

DATE FILED: September 2, 2020 4:08 PM
FILING ID: BE64B50022B3D
CASE NUMBER: 2020CV30189

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of February 6, 2020 (the "Effective Date"), is made by and between BBG Holding Corp., a Colorado corporation ("Seller"), and K Capital, LLC, a Minnesota limited liability company ("Purchaser").

In consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## SECTION 1
## PURCHASE AND SALE

Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell, transfer and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of Seller's right, title and interest in and to the following property (collectively, the "Property"):

1.1.1    That certain parcel of land located in the Town of Avon, Eagle County, Colorado, with the following street address:  77 Metcalf Road (commonly known as "Evans Chaffee Commercial Center"), which is legally described on Exhibit A, together with any and all hereditaments, privileges, easements reversions, remainders, rights-of-way, appurtenances, together with all of Seller's right, title and interest in and to any strips of land, streets, and alleys abutting or adjoining such real property (collectively, the "Land"), but specifically excluding water rights appertaining to or otherwise benefiting or used in connection with such parcel of land, if any;

1.1.2    The buildings, structures, improvements, and fixtures located on the Land, including without limitation the fire and security, and air handling systems and all components thereof (collectively, the "Improvements"; the Land and the Improvements are collectively referred to as the "Real Property"), but excluding fixtures belonging to tenants pursuant to the Leases, if any;

1.1.3    The tenant leases in effect with respect to the Real Property as of the Effective Date, together with any New Leases (as defined in Section 8.2) which do not require Purchaser's consent or to which Purchaser has consented (or has been deemed to have consented) pursuant to Section 8.2 (collectively, the "Leases"), together with all security deposits, guarantees and other items given as security therefor;

1.1.4    The personal property (furniture, equipment, machines, apparatus, or supplies) and intangible property, if any, owned by Seller, located at the Real Property and used solely in connection with Seller's ownership and operation of the Real Property, (the "Personal Property"), with it being understood and agreed that the Leases govern what property is owned by Seller in leased portions of the Property; and

EXHIBIT

1

1.1.5   All assignable service contracts, licenses, franchises, and permits related to the Property, together with any new contracts which do not require Purchaser's consent or to which Purchaser consented pursuant to <u>Section 8.1.2</u> (collectively, the "<u>Contracts</u>").

1.1.6   Warranties.  All right, title and interest of Seller in and to all unexpired warranties, including, without limitation, contractors' and manufacturers' warranties relating to the Property, to the extent that they are assignable (the "Warranties").

1.1.7   Development Rights.  All right, title and interest of Seller in and to all development rights, if any, relating to the construction, use or operation of the Property, to the extent that they are assignable (the "Development Rights").

1.1.8   Drawings.  All right of Seller in and to all site plans, surveys, soil and sub stratus studies, architectural drawings, plans and specifications, engineering, electrical and mechanical plans and studies, floor plans, landscape plans, environmental assessment reports, engineering, structural or physical inspection reports, appraisals, feasibility studies, and other plans and studies of any kind if existing and in Seller's possession or control that relate to the Property, to the extent that they are assignable.

**SECTION 2**
**PURCHASE PRICE**

2.1   <u>Purchase Price; Delivery</u>.  Purchaser shall pay to Seller, as the purchase price for the Property, the amount of Three Million Three Hundred Thousand Dollars ($3,300,000.00) (the "<u>Purchase Price</u>"), which shall be paid as follows:

2.1.1   <u>Initial Deposit</u>.  Within five (5) Business Days following the Effective Date, Purchaser shall deposit with <u>Title Company of the Rockies</u>, whose address is listed in <u>Section 9.1</u> ("<u>Escrow Agent</u>"), the amount of Twenty-Five Thousand Dollars ($25,000) (together with any accrued interest and as it may be increased in accordance with <u>Section 2.1.2</u>, the "<u>Earnest Money</u>").  This Agreement shall automatically terminate if Purchaser does not deposit the Earnest Money with Escrow Agent by such date.

2.1.2   If this Agreement is not terminated by Purchaser before the Due Diligence Contingency Date (as defined in <u>Section 3.1.1</u>.), Purchaser shall increase the Earnest Money by depositing an additional Seventy-Five Thousand Dollars ($75,000) with Escrow Agent within five (5) Business Days after the Due Diligence Contingency Date.

2.1.3   <u>Balance of the Purchase Price</u>.  Subject to the adjustments set forth in <u>Sections 5.3</u> and <u>5.6</u>, Purchaser shall deliver the balance of the Purchase Price to Escrow Agent as confirmed by Escrow Agent on the Closing Date (as defined in <u>Section 5.1</u>).  The deposit shall be made by wire transfer of immediately available funds or other good funds in accordance with the terms and conditions of this Agreement and in accordance with the amount stated on the Settlement Statement (as defined in <u>Subsection 5.7.9</u>).

2

## SECTION 3
## DELIVERIES, INSPECTION AND REPRESENTATIONS

3.1     Inspection Period.

    3.1.1   Contingency Date.  By 5:00 p.m. Mountain Time on the date that is 30 days after Effective Date, as may be extended subject to Section 3.1.5(g), or such earlier date as may be designated by Purchaser  (said time and date, the "Due Diligence Contingency Date"), Purchaser shall determine whether the Property is suitable to purchase in Purchaser's sole and absolute discretion.  Purchaser shall have the right, for any or no reason, to terminate this Agreement on or before the Due Diligence Contingency Date, and the Earnest Money shall be returned to Purchaser and neither party shall have any liability to the other except for obligations which expressly survive termination ("Surviving Obligations").  If Purchaser fails to deliver written notice to Seller exercising this termination right on or before the Due Diligence Contingency Date, then the Earnest Money shall, except as otherwise specifically set forth herein, be non-refundable to Purchaser, and upon the Due Diligence Contingency Date Purchaser shall be conclusively deemed to have approved all aspects of the Property, which shall be re-confirmed upon Closing.

    3.1.2   Deliveries.  Within five (5) Business Days following the Effective Date, Seller or NAI Mountain Commercial (Seller's "Property Manager") acting on the Seller's behalf and with Seller's consent shall (i) deliver to Purchaser copies of, (ii) make available for inspection by the Purchaser at the offices of the Seller or Property Manager, and/or (iii) provide Purchaser with access to a website with the following information related to the Property (to the extent such materials are in Seller's Knowledge (as such term is defined in Section 4.2.15), possession and control):

        (a)     All surveys of the Property (the "Existing Survey");

        (b)     Operating statements showing the revenues and operating expenses of the Property for the past three (3) years, including the current fiscal year;

        (c)     Copies of the Contracts, Warranties and Development Rights;

        (d)     Available plans and Drawings for the Real Property;

        (e)     Copies of any leases or occupancy agreements affecting the Real Property;

        (f)     Real property tax bills and assessment notices related to the Real Property with respect to the current (if available) and immediately preceding taxation years for the Real Property;

        (g)     All surveys, studies, and other documents pertaining to the physical condition of the Property, and any Environmental Matters, including without limitation all site plans, surveys, soil and sub stratus studies, architectural drawings, plans and specifications,

engineering, electrical and mechanical plans and studies, floor plans, landscape plans, environmental assessment reports, engineering, structural or physical inspection reports, appraisals, feasibility studies, and other plans;

(h)    A rent roll accurate and correct to the date of this Contract;

(i)    A schedule of tenant improvement work Seller is obligated to complete but has not yet completed and capital improvement work either scheduled or in process on the date of this Contract, if any;

(j)    All insurance policies pertaining to the Property and copies of any claims which have been made for the past three years;

(k)    Any and all existing documentation and reports regarding Phase I and II environmental reports, letters, test results, advisories and similar documents respective to the existence or nonexistence of asbestos, PCB transformers, or other toxic, hazardous or contaminated substances and/or underground storage tanks and/or radon gas. If no reports are in Seller's possession or known to Seller, Seller warrants that no such reports are in Seller's possession or known to Seller;

(l)    Any Americans with Disabilities Act reports, studies or surveys concerning the compliance of the Property with said Act;

(m)    Filed federal and state tax returns, with schedules, of the Seller for the past three (3) tax years, including the current fiscal year, but only if and to the extent requested by Purchaser's lender for the purchase of the Property ("Lender");

(the above, as well as any other documents or information provided by Seller to Purchaser, the "Property Documents"). Purchaser agrees and acknowledges that it is subject to the confidentiality provision in Section 9.10 with regard the documents and other information provided by Seller under this Section.

3.1.3   Copies of Documents for Inspection. Some documents listed in Section 3.1.2 are not electronically available and are located at Seller's Office or the office of the Property Manager. Purchaser, at its expense, may make copies of the Property Documents. If this Agreement is terminated for any reason prior to Closing, Purchaser shall promptly return all Property Documents (or copies thereof) in its possession or control to Seller.

3.1.4   No Representations as to Property Documents. Except for as provided in Section 4.2, Purchaser acknowledges that the Property Documents are provided or made available for inspection with no representations or warranties as to the truth, accuracy, completeness, methodology of preparation of the Property Documents, or otherwise, of any kind, including without limitation any reports or audits or any other materials, data or other information supplied to Purchaser in connection with Purchaser's inspection of the Property.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

Seller expressly disclaims any such representation or warranty.  Purchaser acknowledges that the Property Documents are provided only for Purchaser's convenience as a starting point for commencing Purchaser's own examination of the Property.  Purchaser agrees that it will rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not only the Property Documents supplied by Seller.  Purchaser expressly disclaims any intent and waives any right to rely on any of the Property Documents provided to it by Seller, and Purchaser agrees that it shall rely solely on its own independently developed or verified information.

        3.1.5    Right of Entry; Limitations.

        (a)    Right of Entry.  Purchaser and its employees, agents and independent contractors, at Purchaser's sole risk, shall have from and after the Effective Date the right to enter the Property during normal business hours and upon reasonable prior notice to Seller to inspect the same, perform surveys, engineering studies, environmental assessments, and other tests and for other investigations and activities consistent with the purposes of this Agreement.  Purchaser must provide Seller with at least one (1) Business Days' prior notice of any such entry and Seller has the right to be present during any such entry and to observe any survey, testing or other investigation.  Purchaser is solely responsible for the costs of any such entry, survey, testing, investigation and restoration, and shall indemnify Seller against any cost thereof.  Purchaser's obligations pursuant to this Subsection 3.1.5(a) shall survive and be enforceable after the Closing or earlier termination of this Agreement.

        (b)    Limitations.  Purchaser must not, under any circumstances, violate any applicable law, rule or regulation in connection with its rights of entry granted hereunder. Purchaser may not perform any physically intrusive inspection, testing or investigation of the Property, including, but without limitation, any inspection which would involve taking subsurface borings or related investigations, and any inspection that would alter the physical condition of the Property, without the approval of Seller.  The right of entry granted in this Agreement is subject to the rights of any grantees under any existing easements (recorded and unrecorded) and the rights of tenants of the Property, and Purchaser shall not interfere with the rights of such grantees and tenants.

        (c)    Restoration and Indemnity.  Purchaser shall restore the Property to its condition existing immediately prior to Purchaser's inspection thereof.  Purchaser agrees to indemnify, defend and hold harmless Seller, its members, managers, agents, employees, officers, directors, shareholders, affiliates, counsel, advisors and asset managers from and against any loss, liability, claims, damage, judgment, demand, cost or expense in any way arising out of or in connection with Purchaser's or its agents', representatives' or independent contractors' acts on the Property including, but not limited to, mechanic's and materialmen's liens filed against Seller or the Property and Purchaser's failure to restore the Real Property as required in this Subsection 3.1.5(c), except if and to the extent caused by Seller or its employees, agents, representatives or contractors.  Purchaser's obligations pursuant to this Subsection shall survive and be enforceable after the Closing or earlier termination of this Agreement.

        (d)    Copies of Reports.  If Purchaser elects not to purchase the Property, Purchaser shall deliver copies of any final reports Purchaser obtains in connection with

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

such inspection to Seller, including, without limitation, any Phase I or Phase II environmental site assessment performed by or on behalf of Purchaser.  Any such delivery shall be made without recourse to Purchaser nor any representation or warranty from Purchaser.

        (e)   <u>Insurance</u>.  Purchaser or agents of Purchaser conducting investigations on behalf of Purchaser shall maintain a policy of comprehensive general liability insurance, with a single combined limit of not less than Two Million Dollars ($2,000,000), insuring all activity and conduct of Purchaser and its agents, representatives and independent contractors during any such entry, including contractual liability coverage.  Seller shall be named as additional insured on such comprehensive general liability policy, and Purchaser shall provide proof of such insurance to Seller, in a form reasonably acceptable to Seller, prior to any such entry.

        (f)   <u>Governmental Approvals</u>.  Nothing contained in this Agreement shall be construed as authorizing Purchaser to apply for a zoning change, variance, subdivision maps, lot line adjustment, or other discretionary governmental act, approval or permit with respect to the Property prior to the Closing, and Purchaser agrees not to do so.  Purchaser agrees not to submit any reports, studies or other documents, including, without limitation, plans and specifications, impact statements for water, sewage, drainage or traffic, environmental review forms, or energy conservation checklists to any governmental agency, or any amendment or modification to any such instruments or documents prior to the Closing, except to the extent required to do so under applicable law.  Purchaser's obligation to purchase the Property is not subject to or conditioned upon Purchaser's obtaining any variances, zoning amendments, subdivision maps, lot line adjustment or other discretionary governmental act, approval or permit.

        (g)   <u>Environmental</u>.    Prior to the Due Diligence Contingency Date Purchaser has the right to obtain environmental inspections of the Property including Phase I and Phase II Environmental Site Assessments, as applicable, compliant with most current version of the applicable ASTM E1527 standard practices for Environmental Site Assessments.  Such Assessments shall be at the expense of Purchaser, and Purchaser shall look to the information that may be revealed in such reports over any environmental representation provided by Seller. If Purchaser's Phase I Environmental Site Assessment recommends a Phase II Environmental Site Assessment, and Purchaser desires to obtain a Phase II Assessment, the Due Diligence Contingency Date shall be extended by thirty (30) days subject to the following provision regarding intrusive testing.  In connection with a Phase II Assessment, Purchaser may not perform any physically intrusive or destructive inspection, testing or investigation of the Property, including, but without limitation, any inspection which would involve taking subsurface borings or related investigations, and any inspection that would alter the physical condition of the Property, without the approval of Seller which approval shall be made in Seller's sole discretion.  If Seller does not grant approval for such intrusive or destructive testing, Purchaser or Seller shall have the option to terminate this Agreement in which case Purchaser shall receive a refund of the Earnest Money and neither party shall have any further liability to the other except for Surviving Obligations.  If the Due Diligence Contingency date is extended Purchaser shall have the right to terminate this Agreement under 3.1.1, on or before the Due Diligence Contingency Date, as it may be extended hereunder, based on unsatisfactory results of Purchaser's environmental inspection.

(h)     Estoppel Certificate.  Seller shall use commercially reasonable efforts to obtain an estoppel certificate in the form of the Estoppel Certificate in Exhibit H signed by the tenant under each of the Leases or occupant of the Property in a form and substance reasonably acceptable to Purchaser, and within twenty (20) days following the Effective Date (the "**Estoppel Certificates Deadline"**) Seller shall promptly deliver to Purchaser signed estoppel certificates for all leases of a premises greater than 1,000 square feet unless requested by Purchaser's Lender.  Purchaser has the right to terminate this Agreement under § 3.1.1, based on any unsatisfactory Estoppel Certificate, in Purchaser's sole subjective discretion or if Seller fails to deliver a required Estoppel Certificate on or before **Estoppel Certificate Deadline**. Purchaser also has the unilateral right to waive any unsatisfactory Estoppel Certificate or any failure to deliver any Estoppel Statement, and failure to terminate this Agreement pursuant to § 3.1.1  based on the rights set forth in this §  3.1.5(h) shall be deemed a waiver of such unsatisfactory matters.

3.2     Title and Survey.

3.2.1     Title Commitment.  Within seven (7) days following the Effective Date, Seller shall obtain, from Title Company of the Rockies (the "Title Company"), and deliver to Purchaser an A.L.T.A. commitment for a standard owner's policy of title insurance (the "Title Commitment") with respect to the Real Property issued by the Title Company along with a copy of each instrument listed as an exception thereon and all plats, declarations, covenants, and conditions of record.  Seller shall pay the premium for a standard ALTA Owner's Policy, and Purchaser shall pay for the deletion of the standard title exceptions any additional coverage and any endorsements to the policy that may be necessary or desired.

3.2.2     Survey.  Purchaser may, at Purchaser's sole cost and expense, order a survey (or a newly re-certified version of the Existing Survey, if any) (the "Amended Survey") of the Property prepared by a surveyor licensed in the State of Colorado.  Purchaser shall cause the Amended Survey to be delivered to Seller concurrently with the delivery thereof to Purchaser.

3.2.3     Title Objections.  Within thirty (30) days after the Effective Date (the "Title Approval Date"), Purchaser shall have examined the Title Commitment and any Existing or Amended Survey that may have been obtained by Purchaser and shall make any objections thereto ("Purchaser's Title Objections") by written notice to Seller (the "Title Objection Notice").  The Title Objection Notice shall state the reasons for Purchaser's objection and the curative steps requested by Purchaser, if any, which would remove the basis for Purchaser's objection.  Any objections to matters shown in the Title Commitment and the Amended Survey (or the Existing Survey if Purchaser does not receive the Amended Survey before the Title Approval Date) to which Purchaser has not objected by the Title Approval Date shall be deemed to be waived by Purchaser and such matters shall be referred to as "Approved Title Matters."

3.2.4     Cure of Title Objections.  Seller shall notify Purchaser of whether it intends to cure any or all of Purchaser's Title Objections within two (2) Business Days of receipt of a Title Objection Notice.  If, with respect to any Purchaser's Title Objection, Seller fails to notify Purchaser of whether or not it intends to cure such Purchaser's Title Objection within such two (2)  Business Day period, Seller shall be deemed to have notified Purchaser that it will not

cure such Purchaser's Title Objection.  If, with respect to any Purchaser's Title Objection, Seller confirms in writing that it will cure such Purchaser's Title Objection, Seller will be allowed until the earlier of five (5) Business Days prior to the originally scheduled Closing Date (the "Title Cure Period") to cure such Purchaser's Title Objection unless some other date is agreed upon by the parties.  If Seller, with respect to any Purchaser's Title Objection (i) notifies Purchaser that it will cure such Purchaser's Title Objection and such cure is not completed within the Title Cure Period, or (ii) notifies Purchaser that it does not intend to cure such Purchaser's Title Objection or is deemed to have elected not to cure such Purchaser's Title Objection, then, by providing written notice of Purchaser's election within two (2) Business Days after the end of the Title Cure Period with respect to clause (i) of this sentence or Purchaser's receipt of Seller's notice with respect to clause (ii) of this sentence, whichever is applicable, Purchaser may elect to do one of the following:

        (a)      Terminate this Agreement and receive a refund of the Earnest Money in which case neither party shall have any further liability to the other except for Surviving Obligations; or

        (b)      Waive one or more of the uncured Purchaser's Title Objections and proceed to Closing.

If Purchaser does not give notice of its election to terminate this Agreement under Subsection 3.2.4(a) or to proceed to Closing under Subsection 3.2.4(b) to be effective within said two (2) Business Day period, Purchaser shall be deemed to have elected to waive Purchaser's Title Objections and proceed to Closing under Subsection 3.2.4(b).

3.2.5   "Permitted Encumbrances" means: means: (a) all of the Approved Title Matters as defined in Section 3.2.3; (b) all matters which would be disclosed by a current survey of the Real Property; and (c) any Purchaser's Title Objections that remain uncured as of the Closing Date as described in Section 3.2.4 (b).

3.2.6   Additional Objections. Purchaser may, at or prior to Closing, notify Seller in writing of any additional objections to title to the Real Property (a) raised by the Title Company between the Title Approval Date and the Closing, which is not otherwise a Permitted Encumbrance, and (b) not disclosed by the Title Company prior to the Title Approval Date, and (c) not disclosed on the Existing Survey or Amended Survey, and (d) not otherwise known to Purchaser prior to the Title Approval Date, provided that Purchaser must notify Seller of such new objection to title within two (2) Business Days of obtaining actual knowledge of the existence of such matter.  If Purchaser sends such notice to Seller, Purchaser and Seller shall have the same rights and obligations with respect to such notice as apply to Purchaser's Title Objections under Sections 3.2.3 and 3.2.4 hereof.

3.3   Rejection of Contracts.  On or before the Due Diligence Contingency Date, Purchaser shall notify Seller in writing of any Contracts that Purchaser will elect to reject at Closing and in such event, Purchaser shall assume all remaining Contracts at the Closing pursuant to the terms of this Agreement.  If Purchaser fails to provide such notice, Purchaser shall be deemed to have elected to assume any and all Contracts.  Seller shall terminate any Contracts that Purchaser elects not to assume as of the Closing Date; however, Purchaser shall

remain responsible for any fees or charges that may be imposed in connection with the early termination of the Vail Honeywagon contract

     3.5    <u>Personal Property</u>. To Seller's Knowledge, there is no Personal Property that belongs to Seller that should be conveyed at Closing.  If Purchaser believes that it has identified Personal Property that should be conveyed with the Property, prior to the expiration the Due Diligence Contingency Date, Purchaser shall notify Seller in writing of any such property and the ownership of such property shall be determined. If, in fact, the property belongs to seller and is Personal Property, the Seller shall convey such Personal Property at Closing.  The parties shall agree on a list of any Personal Property that is to be conveyed to Purchaser prior to the expiration of the Due Diligence Contingency Date.  If Purchaser fails to provide such notice, Purchaser shall be deemed to agreed that no Personal Property will be conveyed in connection with the Property.

**SECTION 4**
**REPRESENTATIONS AND WARRANTIES**

     4.1    <u>Purchaser's Representations and Warranties</u>.  Purchaser represents and warrants to Seller that as of the Effective Date and as of Closing:

     4.1.1    <u>Authority</u>.  Purchaser is a limited liability company duly organized and in good standing under the laws of the State of Minnesota and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all duties and obligations imposed upon it hereunder, and Purchaser has obtained all necessary corporate, partnership or other organizational authorizations required in connection with the execution, delivery and performance of this Agreement and the transaction contemplated herein and has obtained the consent of all entities and parties (whether private or governmental) necessary to bind Purchaser to this Agreement.

     4.1.2    <u>No Conflicts</u>.  Neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale transaction contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions or provisions of any agreement or instrument to which Purchaser is a party or by which Purchaser or any of Purchaser's assets is bound.

     4.1.3    <u>Litigation</u>.  There is no action, suit or proceeding pending or threatened against Purchaser in any court or by or before any other governmental agency or instrumentality which would materially and adversely affect the ability of Purchaser to carry out the transactions contemplated by this Agreement.

     4.1.4    <u>Bankruptcy</u>.  Purchaser has no threatened, pending or actual (i) general assignments for the benefit of creditors, (ii) voluntary petitions in bankruptcy or involuntary petitions by Purchaser's creditors, (iii) appointments of a receiver to take possession of all or substantially all of Purchaser's assets, (iv) attachments or other judicial seizure of all, or substantially all, of Purchaser's assets, (v) inability to pay its debts as they come due, or (vi) offers of settlement, extension or composition to its creditors generally.

9

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

   4.1.5 <u>Due Diligence Representation</u>.  Purchaser represents and warrants to Seller that Purchaser (i) is an experienced and sophisticated purchaser of properties such as the Property, (ii) is specifically familiar with the Property, and (iii) has inspected and examined, or prior to the Due Diligence Contingency Date will inspect and examine, all aspects of the Property and its current condition that Purchaser believes to be relevant to its decision to consummate its purchase of the Property. This <u>Section 4.1.5</u> shall survive the Closing or earlier termination of this Agreement.

   4.2 <u>Seller's Representations and Warranties</u>.  Seller represents and warrants to Purchaser that as of the Effective Date and as of Closing:

   4.2.1 <u>Authority</u>.  Seller is a corporation, duly organized and in good standing under the laws of the State of Colorado and qualified to conduct business in the State of Colorado, and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all duties and obligations imposed upon it hereunder, and Seller has obtained all necessary corporate, partnership or other organizational authorizations required in connection with the execution, delivery and performance of this Agreement and the transaction contemplated herein and has obtained the consent of all entities and parties (whether private or governmental) necessary to bind Seller to this Agreement.

   4.2.2 <u>Bankruptcy</u>.  Seller has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Seller's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

   4.2.3 <u>Condemnation</u>.  Seller has not received written notice of any condemnation proceedings which would materially impair the current use and operation of the Property.

   4.2.4 <u>Litigation</u>.  Except for matters covered by insurance, no litigation has been served upon Seller, nor to the best of Seller's Knowledge has been filed, nor has Seller received written notice of any threatened litigation that will have a material adverse effect on Seller's ability to consummate the transaction contemplated by this Agreement.

   4.2.5 <u>Not Foreign Person</u>.  Seller is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

   4.2.6 <u>Violations</u>.  To Seller's Knowledge, Seller has not received any written notice from any governmental authority that the Property, or any portion thereof, is in material violation of any law, rule or regulation affecting the Property which has not been cured as of the Effective Date, or if such matter arises after the Effective Date, as of the Closing Date.

   4.2.7 <u>Tenancies</u>.  Except for the Leases, the Real Property is not subject to any leases, tenancies or other occupancy agreements.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

    4.2.8   <u>Environmental Matters</u>.  With respect to Environmental Matters and except as otherwise disclosed by Seller to Purchaser in writing in accordance with Section 3.1.2, (i) to the best of Seller's Knowledge, there are no Hazardous Materials unlawfully located on, in, under or about the Property, (ii) to the best of Seller's Knowledge there are no pending or, threatened, legal or administrative proceedings involving the Property or the Seller which relate to or have arisen from the existence of Hazardous Materials unlawfully located on, in, under or about the Property, (iii) to the best of Seller's Knowledge, there are no Environmental Matters, and (iv) to the best of Seller's Knowledge Seller has not unlawfully caused or permitted the unlawful release or discharge of any Hazardous Materials either on, in, under or about the Property at any time during the period of their ownership of the Property.  The capitalized terms used in this subsection that are not otherwise defined herein shall have the meanings provided in Section 11 of this Agreement.

    4.2.9   To the best of Seller's Knowledge, there are no pending or threatened condemnation or similar proceedings affecting the Property, or any part thereof, that have not been previously disclosed to Purchaser; nor to the Knowledge of Seller is any such proceeding contemplated by any governmental authority, except as may have been previously disclosed to Purchaser;

    4.2.10  Seller has not granted to any party any option, contract or other agreement with respect to a purchase or sale of the Property that remains in effect.

    4.2.11  To the best of Seller's Knowledge, there are no mechanics' or materialmen's liens of record against the Property nor are there any unsatisfied charges, debts, liabilities, claims or obligations arising from the construction, ownership, maintenance or operation of or otherwise relating to the Project, which could give rise to any mechanic's or materialmen's or constitutional, statutory or common law lien against the Project, or any part thereof.

    4.2.12  Contracts. To the best of Seller's Knowledge, except for the Permitted Encumbrances and the Contracts assigned to Purchaser at Closing, there are no contracts, agreements or obligations of any kind or nature relating to the Property and to which Purchaser will be bound or the Property will be subject after Closing. Seller has not received any written notice that it is in default of any of its obligations under the Permitted Encumbrances or the Contracts. To the best of Seller's Knowledge, there are no Contracts other than those disclosed by Seller to Purchaser hereunder.

    4.2.13  To the best of Seller's Knowledge, none of the Property Documents contain any untrue statement of material fact or omits to state any material facts necessary to make the statements contained herein or therein not misleading.

    4.2.14  To Seller's Knowledge, there is no Personal Property that belongs to Seller that should be conveyed at Closing.

    4.2.15  <u>Definition of Seller's Knowledge</u>.  Michele Evans, the President of Seller, is the individual within Seller's organization most familiar with the Property.  Ms. Evans has familiarity and knowledge of the Property as an investor and tenant, but Ms. Evans does not have

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

day-to-day or operational knowledge of the status and condition of the Property, Personal Property or the Leases. "<u>Seller's Knowledge</u>" means the current actual knowledge of Michele Evans without independent inquiry or investigation.

        4.2.16  <u>Right to Update</u>.  Prior to the Closing Date, Seller shall promptly notify Purchaser in writing of any facts, conditions or circumstances which come to Seller's Knowledge that render any of the representations and warranties set forth in this <u>Section 4.2</u> in any way inaccurate, incomplete, incorrect or misleading.  In the event of any update to Seller's warranties and representations, Seller shall not be in default hereunder and shall have no liability as a result thereof.  If an updated representation or warranty has a material adverse effect on the current use of the Property or Seller's ability to consummate the transaction contemplated by this Agreement, Purchaser's sole right and remedy as a result thereof shall be the right to terminate this Agreement by giving written notice thereof to Seller, and thereupon the Earnest Money shall be refunded to Purchaser and neither party shall have any further rights or obligations, hereunder, except for Surviving Obligations.  The warranties and representations set forth in this <u>Section 4.2</u> shall survive Closing for a period of twelve (12) months.

        4.2.17  Each of the representations and warranties contained in this Section 4 are acknowledged by Seller to be material and to be relied upon by Purchaser in proceeding with this transaction, shall be deemed to have been remade by Seller as of the Closing Date and shall survive Closing for a period of 12 months beginning on the Closing Date.

        4.3    <u>"AS IS" SALE</u>.  PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED REAL ESTATE INVESTOR AND WILL HAVE ADEQUATE OPPORTUNITY TO INSPECT THE PROPERTY, AND THAT PURCHASER SHALL RELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND ACCEPTS THE RISK THAT ANY INSPECTION MAY NOT DISCLOSE ALL MATERIAL MATTERS AFFECTING THE PROPERTY.  SUBJECT ONLY TO THE TERMS OF <u>SECTIONS 4.2 AND 6.1</u>, PURCHASER AGREES TO ACCEPT THE PROPERTY IN ITS "AS IS" "WHERE IS" AND "WITH ALL FAULTS" CONDITION AT CLOSING, WITHOUT ANY RIGHT OF SET-OFF OR REDUCTION IN THE PURCHASE PRICE.  PURCHASER FURTHER AGREES, EXCEPT AS OTHERWISE PROVIDED HEREIN, TO ACCEPT THE PROPERTY WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS, IMPLIED OR OTHERWISE, INCLUDING WITHOUT LIMITATION AS TO THE:  (A) VALUE, NATURE, QUALITY OR PHYSICAL CONDITION OF THE PROPERTY; (B) INCOME DERIVED FROM THE PROPERTY; (C) MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS OF THE PROPERTY FOR A PARTICULAR PURPOSE; (D) COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY GOVERNMENTAL AUTHORITY OR BODY; (E) MANNER OR QUALITY OF CONSTRUCTION OR MATERIALS INCORPORATED INTO THE PROPERTY; (F) MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (G) THE ENVIRONMENTAL CONDITION OF THE PROPERTY; OR (H) ANY OTHER MATTER REGARDING THE PROPERTY, AND SELLER EXPRESSLY DISCLAIMS EACH AND EVERY SUCH REPRESENTATION AND WARRANTY. PURCHASER ASSUMES ALL RESPONSIBILITY FOR THE EVALUATION OF ITS INVESTIGATIONS OR ITS FAILURE TO INVESTIGATE ANY ASPECT OF THE PROPERTY.  PURCHASER RELEASES SELLER AND ANY PARTY RELATED TO OR

AFFILIATED WITH SELLER, AND THEIR RESPECTIVE REPRESENTATIVES, SUCCESSORS AND ASSIGNS (THE "SELLER RELATED PARTIES") FROM AND AGAINST ANY AND ALL DEMANDS AND CLAIMS AT LAW OR EQUITY IN CONNECTION WITH THIS SECTION 4.3. THE PROVISIONS OF THIS SECTION 4.3 SHALL SURVIVE THE CLOSING

## SECTION 5
## CLOSING

5.1     Closing.  The closing of the purchase and sale transaction contemplated in this Agreement (the "Closing") shall take place on the fifteenth (15th) day following the Due Diligence Contingency Date (the "Closing Date").

5.2     Possession.  Possession of the Property shall be delivered to Purchaser at the Closing.

5.3     Prorations.  The following adjustments will be made to the Purchase Price at the Closing.

5.3.1   General.  All prorations made under this Section 5.3 with respect to the Property for the month in which the Closing occurs shall be prorated as of 11:59 p.m. Mountain Time on the day immediately preceding the Closing Date (the "Adjustment Date").

5.3.2   Taxes.

(a)     General.  Seller shall be responsible for the payment of real estate, ad valorem, personal property taxes and other state, county and municipal taxes (collectively, "Real Estate Taxes") and assessments for all periods through the Adjustment Date.  Real Estate Taxes and assessments shall be prorated for the period for which such Real Estate Taxes and assessments are assessed, whether or not such taxes and assessments are due and payable on or prior to the Closing Date, on the basis of the number of days in such period the Property will have been owned by Seller and Purchaser, respectively.  If the current tax bill is not available at Closing, then the proration shall be made on the basis of Real Estate Tax bills for the prior year and such proration shall be final.

(b)     Special Assessments.  Purchaser shall assume all special assessments (and charges in the nature of or in lieu of such assessments) levied, pending or constituting a lien with respect to any of the Real Property as of the Adjustment Date, to the extent applicable to the period on or after the Closing Date.

(c)     Insurance.  Seller shall cancel any insurance policies maintained by Seller with respect to the Property as of the Closing Date, and Seller shall be entitled to any refund of insurance premiums with respect thereto.

5.3.3   Utilities; Utility Deposits.

(a)   All utility expenses, including water, fuel, gas, electricity, telephone, sewer, trash removal, steam, heat and other services furnished to or provided for the Property shall be prorated between Seller and Purchaser.

(b)   Seller agrees to have all meters with respect to any such utilities read as of the Adjustment Date.  If a reading or the results thereof cannot be obtained by the Closing, then such charges, if any, shall be apportioned based on extrapolation from the last reading therefor, subject to adjustment when the actual amount becomes known after the Closing.  Utility deposits owned by Seller, if any, together with any accrued interest thereon, shall be retained by Seller and not transferred to Purchaser at Closing.

5.3.4   Rents.  Rental income (including, but not limited to, operating expense reimbursements and additional rent) and all other amounts paid by tenants under the Leases shall be prorated.  Delinquent rents or unreconciled underpayments of common area costs shall not be prorated.  Seller shall assign such delinquent rent or underpayment rights to Purchaser and Seller shall be credited for the same at Closing.

5.3.5   Security Deposits.  Purchaser shall receive a credit against the Purchase Price in an amount equal to the aggregate amount of all tenant security deposits, together with any accrued interest owed to tenants (reduced to the extent applied by Seller or any prior owner of the Property to tenant charges in accordance with the terms of the Leases).

5.3.6   Percentage Rentals.  Seller represents and warrants that none of the Leases contain provisions for the payment of percentage rent.

5.3.7   Lease up Costs.  "Lease-Up Costs" means the costs of:  leasing commissions, legal fees, and initial tenant improvements and allowances incurred in leasing any portion of the Real Property (including from the exercise by existing tenants of existing options under the Leases).  Seller shall remain solely responsible for all Lease-Up Costs for each Lease made, renewed or expanded prior to the Effective Date (the "Pre-Effective Date Lease-Up Costs").  Purchaser shall assume and be solely responsible for all Lease-Up Costs for each Lease made, renewed or expanded on or after the Effective Date (the "Post Effective Date Lease-Up Costs").  At the Closing, Purchaser shall be given a credit for the amount of all unpaid Pre-Effective Date Lease-Up Costs, and Purchaser shall assume and be responsible for such Pre-Effective Date Lease-Up Costs, and Seller shall be given a credit for any Post Effective Date Lease-Up Costs that have actually been paid by Seller prior to Closing.  Notwithstanding anything to the contrary herein, Lease-Up Costs shall not include free rent or rent abatement, and Purchaser shall assume any such free rent or rent abatement, if any, effective after Closing.

5.3.8   Service Contracts; Miscellaneous.  Charges and revenues arising out of Contracts which Purchaser is to assume shall be prorated between Seller and Purchaser at the Closing.  Vending equipment owned or leased by Seller shall have their coins removed for the account of Seller on the Adjustment Date.  Seller shall pay for all deliveries and services rendered through the Adjustment Date.  Any supply items on order in the ordinary course of

business, but undelivered as of the Adjustment Date, will be accepted by Purchaser, the charges for the same to be paid by Purchaser directly to the supplier.

        5.3.9   [Intentionally Omitted.]

    5.4    [Intentionally Omitted.]

    5.5   <u>Other Documents</u>.  Seller shall execute such affidavits and agreements as are required by the Title Company in connection with the issuance of the Title Commitment.

    5.6   <u>Closing Costs</u>.  Seller shall pay: (1) one-half of Escrow Agent's fees; (2) one-half of any fee for real estate closing services; (3) the base premium for the Title Policy, (4) one-half of the 2% real estate transfer tax payable to the Town of Avon; and (5) and recording or other fees for the release of any deeds of trust, liens or encumbrances on the Property.  Purchaser shall pay: (i) any additional premiums for extended coverage or endorsements to the Title Policy (if Purchaser opts for such coverage); (ii) one-half of Escrow agent's fees; (iii) one-half of any fee for real estate closing services; (iii) the documentary fee on the Deed; (iv) one-half of the 2% real estate transfer tax payable to the Town of Avon and (v) all recording fees for the Deed and any deeds of trust benefitting Purchaser.  Each party shall be responsible to pay its own legal expenses for this transaction.  All other costs related to the transaction shall be paid by the parties in the manner consistent with customary practice for real property sales in the County.

        5.6.1   <u>Attorneys' and Professional Fees</u>.  Notwithstanding the foregoing, each party shall pay its own attorneys' fees and fees of any accountants and/or advisors incurred in connection with the transaction contemplated in this Agreement.

    5.7   <u>Seller's Obligations at the Closing</u>.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following, duly executed and acknowledged where applicable:

        5.7.1   <u>Deed</u>.  A special warranty deed conveying the Real Property to Purchaser, subject to the Permitted Encumbrances, in the form attached to this Agreement as <u>Exhibit B</u>.

        5.7.2   <u>Assignment of Leases</u>.  An Assignment and Assumption of Leases in the form attached to this Agreement as <u>Exhibit C</u> (the "<u>Assignment of Leases</u>").

        5.7.3   <u>Assignment of Service Contracts, Permits and Warranties</u>.  An Assignment and Assumption of Service Contracts, Permits and Warranties in the form attached to this Agreement as <u>Exhibit D</u> (the "<u>Assignment</u>").

        5.7.4   <u>Bill of Sale</u>.  A bill of sale in the form attached to this Agreement as <u>Exhibit E</u> (the "<u>Bill of Sale</u>"), conveying the Personal Property to Purchaser free and clear of all encumbrances.

        5.7.5   <u>FIRPTA Affidavit</u>.  An affidavit of Seller in form attached to this Agreement as <u>Exhibit F</u>, and if applicable and required, any equivalent state forms, certifying that Seller is not a "foreign person," as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and in any applicable state laws for the State in which the Real Property is located.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

5.7.6   <u>Tenant Notices</u>.  Notice to tenants under the Leases in the form attached to this Agreement as <u>Exhibit G</u>.

5.7.7   <u>Transfer Tax Forms; Other Forms</u>.  All transfer tax and other similar tax returns which Seller is required by law to execute and acknowledge and to deliver, either individually or together with Purchaser, to any governmental authority as a result of the sale.

5.7.8   <u>Records, Files and Keys</u>.  To the extent not already delivered to Purchaser, those records and files in Seller's possession and control relating to operations, leasing and maintenance and all keys, access codes and such other passwords in Seller's possession and control related to access to the Property, provided that the parties agree to cooperate to deliver such items outside of escrow.

5.7.9   <u>Settlement Statement</u>.  A settlement statement, showing the application of the Earnest Money against the Purchase Price, the allocation of the Closing Costs and other prorations and closing adjustments set forth in this Agreement, all consistent with the terms and conditions of this Agreement (the "<u>Settlement Statement</u>").

5.7.10   <u>Evidence of Authority</u>.  Such authorizing documents of Seller as shall be reasonably required by the Title Company to evidence Seller's authority to consummate the transactions contemplated by this Agreement.

5.8   <u>Purchaser's Obligations at the Closing</u>.  At the Closing, Purchaser shall cause the following to be delivered to Seller, each duly executed and acknowledged, as applicable:

5.8.1   <u>Purchase Price</u>.  The portion of the Purchase Price payable pursuant to <u>Section 2.1</u>, as adjusted pursuant to <u>Sections 5.3</u> and <u>5.6</u>, and such other amounts as may be due from Purchaser pursuant to the Settlement Statement, by wire transfer of immediately available funds or good funds to Seller.  The Earnest Money shall be applied to and credited against the Purchase Price and shall be disbursed to Seller by Escrow Agent at Closing.

5.8.2   <u>Evidence of Authority</u>.  Such authorizing documents of Purchaser as shall be reasonably required by the Title Company to evidence Purchaser's authority to consummate the transactions contemplated by this Agreement.

5.8.3   <u>Assignment of Leases</u>.  A counterpart of the Assignment of Leases.

5.8.4   <u>Assignment of Service Contracts Permits and Warranties</u>.  A counterpart of the Assignment <u>Service Contracts Permits and Warranties</u>.

5.8.5   <u>Transfer Tax Forms</u>.  All transfer tax and other similar tax returns which Purchaser is required by law as a result of the transaction to execute and acknowledge and to deliver, either individually or together with Seller, and Purchaser's payment of any such tax due to any governmental authority as a result of the sale.

5.8.6   <u>Settlement Statement</u>.  A counterpart of the Settlement Statement.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

5.9     Closing Escrow.  Purchaser and/or Seller at their option may deposit the respective Closing deliveries described in Sections 5.7 and 5.8 with Escrow Agent with appropriate instructions for recording and disbursement consistent with this Agreement.

5.10   Purchaser's Closing Conditions.  The obligations of Purchaser under this Agreement are contingent upon each of the following conditions:

5.10.1   Representations and Warranties.  On the Closing Date, each of the representations and warranties of Seller in Section 4.2 shall be true and correct in all material respects as if the same were made on the Closing Date, subject to Seller's right to update such representations and warranties as provided in this Agreement.

5.10.2   Performance by Seller.  By the Closing Date, the Seller shall have performed all covenants and obligations in all material respects and complied with all material conditions required by this Agreement to be performed or complied with by Seller.

5.10.3   Condition of Property.  The Property is in substantially the same condition as of the Effective Date, subject to normal wear and tear and the terms of Sections 6.1 and 6.2.

5.11   Seller's Closing Conditions.  The obligations of Seller under this Agreement are contingent upon each of the following conditions:

5.11.1   Representations and Warranties.  On the Closing Date, each of the representations and warranties of Purchaser in Section 4.1 shall be true and correct in all material respects as if the same were made on the Closing Date.

5.11.2   Performance by Purchaser.  By the Closing Date, the Purchaser shall have performed all covenants and obligations in all material respects and complied with all material conditions required by this Agreement to be performed or complied with by Purchaser.

## SECTION 6
## RISK OF LOSS

6.1     Condemnation.  If any Material (as defined below) portion of the Property is taken by eminent domain proceedings or by deed in lieu thereof prior to the Closing, Seller shall promptly notify Purchaser of such fact ("Seller's Condemnation Notice").  Thereafter, Purchaser may (at Purchaser's option), either: (a) terminate this Agreement by written notice, in which case Purchaser shall be entitled to the return of the Earnest Money, and thereafter neither party shall have any rights or obligations under this Agreement, other than Surviving Obligations, or (b) proceed to Closing.  Purchaser shall notify Seller in writing of Purchaser's election within five (5) Business Days after Seller's Condemnation Notice.  If Purchaser fails to timely and properly notify Seller of Purchaser's election, Purchaser is deemed to have elected to terminate this Agreement under clause (a).  If Purchaser chooses to proceed under clause (b), or if the taking is not Material, then Seller shall assign all of Seller's assignable right, title and interest in and to the award of the condemning authority, or the settlement in the case of a deed in lieu of condemnation, to the extent not applied by Seller towards restoration of the Real Property prior to the Closing and less Seller's reasonable attorneys' fees and costs and other expenses related to the condemnation proceeding, to Purchaser at the Closing and there shall be no reduction in the

Purchase Price.  A taking is "Material" if any portion of the Improvements are taken or if any portion of the Land is taken which would materially affect access to the Improvements or cause the Property not to comply with applicable law.

6.2     Casualty.  If any of the Property, or any part thereof, suffers any Material damage from fire or casualty prior to the Closing, Seller will notify Purchaser of such fact (the "Seller's Casualty Notice"), and Purchaser may terminate this Agreement by notice to Seller given within ten (10) days following Seller's Casualty Notice to Purchaser, in which case Purchaser shall be entitled to the return of the Earnest Money, and thereafter neither party shall have any rights or obligations under this Agreement, other than Surviving Obligations.  If Purchaser does not terminate this Agreement, or if the damage suffered is not Material, Purchaser shall proceed to Closing without adjustment to the Purchase Price and Seller shall have no obligation for any repair or restoration to the Property, in which event upon the Closing, Purchaser shall be entitled to any compensation, insurance proceeds, awards or other payments or relief resulting from such casualty or condemnation proceeding relating to the Property and Purchaser shall be credited at the Closing with the amount of any deductible under the applicable insurance policies in the event of any such casualty.  A casualty is "Material" if such casualty results in damage to the Property which will cost more than $25,000 to repair.

## SECTION 7
## DEFAULT; TERMINATION

7.1     Default by Seller.  Seller shall be in default hereunder if: (i) any material representation or warranty made by Seller is false or to Seller's Knowledge becomes false in any material respect and Seller fails to update or correct its representations and warranties as provided herein; (ii) Seller fails to cure (within the time frame set forth below) any material breach of any obligation of Seller under this Agreement; or (ii) Seller refuses to convey title to the Property in accordance herewith. As a condition precedent to the exercise of its remedies under this Section, Purchaser shall be required to give Seller written notice of the same. Seller shall have until five (5) days from the receipt of such notice (provided however, there is no requirement of Notice and cure for the obligation to close on the Closing Date).  The parties agree that the remedies available to Purchaser, in the event of a breach hereunder by Seller shall be limited to either (I) the right to terminate this Agreement, in which case (A) Seller shall reimburse Purchaser for its actual out-of-pocket due diligence expenses and costs paid in connection with the transaction contemplated by this Agreement, including, without limitation reasonable attorneys' fees and costs, in an amount not to exceed $25,000.00 in the aggregate (collectively, the "Due Diligence Expenses"), (B) the Title Company shall return the Earnest Money to Purchaser, (C) Seller shall pay any cancellation charges of the Title Company, and (D) both parties shall be discharged from all duties and performance hereunder, except for any obligations which by their terms survive any termination of this Agreement, or (II) the right to enforce the specific performance of this Agreement and/or assert a claim for damages for breach of contract or both, and legal fees and expenses in connection with such legal action provided that such claim is brought within one hundred and eighty (180) days of such breach.  Nothing contained in this Agreement shall limit Purchaser's post-Closing right to recover damages resulting from a breach of any of Seller's representations, warranties, indemnifications and Surviving Obligations; provided, however, notwithstanding the foregoing, if Seller has provided written notice to Purchaser prior to the Closing that any representation or warranty hereunder is

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

untrue and permits Purchaser the right to terminate, or if any covenant or condition to Closing has not been fulfilled or satisfied, and Purchaser nonetheless knowingly proceeds to close on the purchase of the Property, then Purchaser shall be deemed to have irrevocably and absolutely waived, relinquished and released all rights and claims against Seller for any damage or other loss arising out of or resulting from such untrue representation or warranty or such unfulfilled or unsatisfied covenant or condition.

7.2     Default by Purchaser.  In the event that Purchaser (i) materially defaults in the performance of any of its obligations under this Agreement other than its obligation to proceed to Closing, which default remains uncured for five (5) Business Days after written notice thereof to Purchaser; (ii) defaults in its obligation to close or otherwise fails to consummate the transaction contemplated by this Agreement; or (iii) fails to pay the sums required to be paid by Purchaser under this Agreement which non-payment remains uncured for five (5) Business Days after written notice thereof to Purchaser, except that the non-payment of the Purchase Price at Closing which shall be an immediate and material default that cannot be cured, Seller may terminate this Agreement by providing written notice of termination to Purchaser.  Upon a termination by Seller under this Section 7.2 or Section 9.14, Seller shall be entitled to receive and retain the Earnest Money as liquidated damages (and not as a penalty or forfeiture) and as Seller's sole and exclusive remedy and relief hereunder (except for Surviving Obligations), the Earnest Money shall be automatically forfeited to Seller, and Escrow Agent shall pay the Earnest Money to Seller promptly after receiving written demand therefor from Seller.  Seller and Purchaser acknowledge that the actual damages to Seller that would result from such failure would be extremely difficult to calculate or establish on the date hereof.  In addition, Purchaser desires to have a limitation put upon its potential liability to Seller in the event of such failure by Purchaser.  Seller and Purchaser specifically acknowledge and agree, after negotiation between Seller and Purchaser, that the amount of the Earnest Money constitutes reasonable compensation to Seller for such failure by Purchaser and shall be disbursed to Seller as liquidated damages in the event of such failure by Purchaser.  If Seller becomes aware prior to the Closing that any representation or warranty hereunder is untrue, or any covenant or condition to Closing has not been fulfilled or satisfied, and Seller nonetheless proceeds to close on the purchase of the Property, then Seller shall be deemed to have irrevocably and absolutely waived, relinquished and released all rights and claims against Purchaser for any damage or other loss arising out of or resulting from such untrue representation or warranty or such unfulfilled or unsatisfied covenant or condition.  None of the provisions of this Section 7.2 shall limit, impair or affect Surviving Obligations.

7.3     Confirmation of Termination.  If this Agreement is terminated by either party pursuant to the terms set forth herein, then upon at the request of Seller, Purchaser shall execute a quit claim deed, or other confirmation of termination reasonably satisfactory to Seller and Purchaser in form and substance, promptly upon written demand by Seller.

## SECTION 8
## FUTURE OPERATIONS

8.1     <u>Maintenance and Contracts</u>.  From the Effective Date through the Closing or earlier termination of this Agreement:

8.1.1    Seller shall continue to operate the Property in the customary and ordinary manner consistent with Seller's current practices in effect as of the Effective Date, ordinary wear and tear, condemnation and casualty excepted; and

8.1.2    Seller will perform all of Seller's material obligations under the Contracts. After the Due Diligence Contingency Date, Seller shall not enter into any new Contract or other service agreement that cannot be terminated as of the Closing Date, without Purchaser's prior written consent which consent shall be in Purchaser's sole discretion.  Additionally, after Purchaser delivers its Contract notice to Seller under <u>Section 3.3</u>, Seller shall not, without the prior written consent of Purchaser, which consent shall be in Purchaser's sole discretion, modify or renew any existing Contract.

8.2     <u>Leasing</u>.

8.2.1    <u>New Leases</u>.  "<u>New Lease</u>" means any new lease or occupancy or use agreement relating to the Real Property with tenants or any other party, and any renewal, material amendment and extension of any existing Lease, entered into or proposed to be entered into by Seller after the Effective Date.  Seller does not need Purchaser's consent to enter into any New Lease prior to the fifth (5th) days before the Due Diligence Contingency Date, but Seller shall deliver a copy of each New Lease to Purchaser at least five (5) days prior to the Due Diligence Contingency Date.  From and after the fifth (5th) day prior to the Due Diligence Contingency Date, Purchaser shall have the right to consent to any New Lease.  From and after the fifth (5th) day prior to the Due Diligence Contingency Date, Seller shall promptly deliver to Purchaser copies of any proposed New Lease for Purchaser's approval.  If Purchaser fails to object in writing to any New Lease for which Purchaser has consent rights as provided in this Section within five (5) days after Seller's written request for approval, Purchaser is deemed to have approved the New Lease.  Any objection to a New Lease by Purchaser shall be in writing and shall set forth with specificity the nature of Purchaser's objection.  Purchaser's consent is not required for the exercise by tenants of rights set forth in existing Leases, to the extent all of the economic terms therefor have been agreed to in the existing Lease, but not otherwise.

8.2.2    <u>No Representation or Warranty</u>.  Seller makes no representation or warranty to Purchaser that any particular Lease or tenancy will be in force or effect at the Closing or that the tenants under any Leases will have performed their obligations thereunder.  If Purchaser does not approve any New Lease requiring Purchaser's approval, Seller shall not execute or deliver same.

8.2.3    <u>Evans Chaffee Leases</u>. In connection with the leases whereby Evans Chaffee Construction Group is a tenant, upon Closing such leases shall be assigned to Purchaser and amended to change the remaining lease terms to be for five (5) years from the earlier of Closing Date or March 9, 2020 in the form attached hereto as Exhibit I.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

## SECTION 9
## MISCELLANEOUS

9.1    Notices.  All notices, demands, requests and other communications which may be given or which are required to be given by either party to the other under this Agreement, must be in writing and shall be deemed effective and delivered either:  (a) on the date personally delivered to the address of the recipient set forth below, as evidenced by written receipt therefor, whether or not actually received by the person to whom addressed; (b) on the third (3rd) Business Day after being sent, by certified or registered mail postage prepaid, return receipt requested, addressed to the intended recipient at the address specified below; (c) on the first (1st) Business Day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal Express Corporation, Airborne Express, or United Parcel Service, addressed to the recipient at the address specified below; or (d) at the time of electronic mail or electronic confirmation of receipt by facsimile after being sent before 5:00 p.m. local time of recipient on a Business Day to the electronic mail addresses or the facsimile numbers set forth below for each recipient, provided that a copy is also sent by nationally recognized overnight delivery service.  For purposes of this Section 9.1, the addresses of the parties for all notices are as follows (unless changed by similar notice in writing given by particular person whose address is to be changed):

| | |
|---|---|
| If to Seller: | BBG Holding Corp |
| | PO Box 8266 |
| | Avon, CO 81620-8266 |
| | Attn:        Michele Evans |
| | Phone:      970-845-0466 |
| | Email:       mevans@evanschaffee.com |
| | |
| If to Purchaser: | K Capital, LLC |
| | 229 Minnetonka Ave S Unit 369 |
| | Wayzata, MN 55391 |
| | |
| | Attn:       Mikhail Kaminski |
| | Phone:      (612)360-4900 |
| | Email:       mgkaminski10@gmail.com |
| | |
| With a copy to: | Daniel Wolf, Esq. |
| | Mountain Law Group |
| | 953 S. Frontage Rd., Ste. 222 |
| | Vail, CO 81657 |
| | Email: dwolf@mountainlawgroup.com |

| If to Escrow Agent: | Title Company of the Rockies |
| | 10 W. Beaver Creek Blvd #221 |
| | Avon, CO 81620-980 |
| | |

| Attn: | Sheilah Gordon |
| Phone: | 970-949-9497 |
| Email: | SGordon@TitleCoRockies.com |

The attorneys for each party are authorized to give any notice specified in this Agreement on behalf of their respective clients.

      9.2      <u>Real Estate Commissions</u>.  Neither Seller nor Purchaser has authorized any broker or finder to act on Purchaser's or Seller's behalf in connection with the sale and purchase hereunder other than Steven Sendor and Erich Schmidt of NAI Mountain Commercial ("Purchaser's Broker") and Jules Sherwood of Kenai Capital Advisors ("Seller's Broker"), and neither Seller nor Purchaser has dealt with any broker or finder purporting to act on behalf of the other party other than the brokers identified herein.  Seller shall pay Purchaser's Broker and Seller's Broker a real estate commission in accordance with a separate written listing agreement. Purchaser agrees to indemnify, defend, protect and hold harmless Seller from and against any and all demands, claims, losses, damages, liabilities, costs or expenses of any kind or character (including reasonable attorneys' fees and charges) arising out of or resulting from any agreement, arrangement or understanding made by Purchaser or on Purchaser's behalf with any broker or finder in connection with this Agreement or the transaction contemplated hereby. Seller agrees to indemnify, defend, protect and hold harmless Purchaser from and against any and all claims, losses, damages, liabilities, costs or expenses of any kind or character, including reasonable attorneys' fees and expenses, arising out of or resulting from any agreement, arrangement or understanding made by Seller or on Seller's behalf with any broker or finder in connection with this Agreement or the transactions contemplated hereby.  Notwithstanding anything to the contrary contained herein, this Section 9.2 shall survive the Closing or any earlier termination of this Agreement.

      9.3      <u>Entire Agreement</u>.  This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there is no oral or written agreement between the parties, nor any representation made by either party relative to the subject matter hereof, which is not expressly set forth herein.

      9.4      <u>Amendment</u>.  This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

      9.5      <u>Headings</u>.  The captions and headings used in this Agreement are for convenience only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

      9.6      <u>Time of Essence</u>.  Time is of the essence of this Agreement; however, if the final date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then the time of such period shall be extended to the first succeeding Business Day.  The term "<u>Business Day</u>" means every day other than Saturdays, Sundays or other

holidays on which banking institutions in the state in which the Real Property is located are closed.

      9.7     <u>Successors and Assigns; Assignments; Tax Free Exchanges</u>.

      9.7.1    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns.

      9.7.2    <u>Assignments</u>.  Prior to Closing, Purchaser shall have the right to assign or transfer its rights under this Agreement to any Affiliate (defined below), provided that such assignee concurrently with such assignment assumes, in a written instrument delivered to Seller, all of the obligations and liabilities of Purchaser hereunder.  Purchaser shall not otherwise assign or transfer its rights under this Agreement without first obtaining Seller's written consent.  Upon such an assignment, the assignee shall become the Purchaser for all purposes of this Agreement, but in no event shall the Purchaser named herein be relieved of any obligation or liability hereunder.  As used herein, "Affiliate" means any limited liability company, limited partnership, corporation or other entity which, directly or indirectly, is majority beneficially owned by Purchaser or some or all of Purchaser's owners, spouses or immediate family members.  Subject to <u>Section 9.7.3</u> and except as otherwise provide above, Purchaser may not assign this Agreement or Purchaser's rights under this Agreement without the prior written consent of Seller, which consent may be withheld in Seller's sole and absolute discretion.  No assignment of this Agreement or Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement.  This Agreement is solely for the benefit of Seller and Purchaser; there are no third-party beneficiaries hereof.  Any assignment of this Agreement in violation of the foregoing provisions shall at Seller's option be null and void.

      9.7.3    <u>Tax Free Exchanges</u>.  Notwithstanding <u>Section 9.7.2</u>, if either party desires to purchase or sell the Property in connection with a tax-deferred exchange under Section 1031 of the Internal Revenue Code of 1986, that party (the "<u>Exchanging Party</u>") may assign its rights under this Agreement to a "qualified exchange intermediary" within the meaning of that said Section 1031.  In such case, the other party (the "<u>Non-Exchanging Party</u>") shall sign such documents, and otherwise reasonably cooperate, as may be reasonably necessary to complete the tax-deferred exchange, including delivering or receiving the Deed or all or a portion of the Purchase Price to or from a third party, provided that the Exchanging Party shall pay any expense incurred by the Non-Exchanging Party as a result of such cooperation, and such cooperation shall not increase the obligations or potential liability of the Non-Exchanging Party under this Agreement or delay the Closing Date or other timeframes set forth in this Agreement.

      9.8     <u>Invalid Provision</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

9.9     Attorneys' Fees.  In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover and shall be awarded by the presiding decision-maker, in addition to all other remedies or damages as provided herein, reasonable attorneys' fees and expenses incurred in such suit.

9.10     Confidentiality.  All non-public information provided by Seller to Purchaser or obtained by Purchaser relating to the Property in the course of Purchaser's inspection, including, without limitation, (a) the Property Documents, (b) any environmental assessment or audit, (c) the identities of Seller and Purchaser, and the fact that they have entered into this Agreement, and (d) the terms of this Agreement (collectively, the "Information") shall be treated as confidential by Purchaser and Seller.  Purchaser agrees to transmit the Information only to such of its attorneys, accountants, consultants, equity investors and lenders ("Representatives") who need to know the Information for the sole purpose of Purchaser's review and who agree to maintain the confidentiality of such Information.  Seller and Purchaser agree not to make any public announcements or disclosures prior to the Closing with respect to the subject matter hereof, except by Seller to tenants at the premises, without the written consent of the other party. In the event that this transaction is not closed for any reason, then Purchaser shall return to Seller all copies of all Information in its possession or in the possession of any of its Representatives, shall maintain the confidentiality of the Information, and shall require all Representatives not to disclose any Information to any other party.  The provisions of this Section 9.10 shall survive the termination of this Agreement.

9.11     No Survival.  Except as otherwise expressly provided otherwise in this Agreement, any and all rights of action of either party for any breach by the other party or any representation, warranty, covenant or other obligation of such party contained in this Agreement shall merge with the Deed and other instruments executed at Closing and shall not survive Closing, and no action based thereon shall be commenced after the Closing Date.

9.12     Multiple Counterparts.  This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one agreement.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.

9.13     Exhibits.  The exhibits and schedules attached to this Agreement and referred to herein are hereby incorporated into this Agreement by reference and made a part hereof for all purposes.

9.14     Construction; Independent Counsel.  Seller and Purchaser each acknowledge that: (a) they have been represented by independent counsel in connection with this Agreement; (b) they have executed this Agreement with the advice of such counsel; and (c) this Agreement is the result of negotiations between the parties hereto and the advice and assistance of their respective counsel. The fact that this Agreement was prepared by Seller's counsel as a matter of convenience shall have no import or significance, and the normal rule of contractual construction and interpretation to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

9.15    <u>No Recordation</u>.  Seller and Purchaser hereby acknowledge that neither this Agreement nor any memorandum or affidavit thereof shall be recorded of public record.

9.16    <u>JURY WAIVER</u>.  PURCHASER AND SELLER DO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER OR BY SELLER AT CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THIS AGREEMENT OR THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES OTHERWISE VOID OR VOIDABLE).  THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH PARTY TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY THE OTHER PARTY AT CLOSING AND SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.

9.17    <u>Governing Law</u>.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Colorado without regard to conflicts of law principles. The provisions of this <u>Section 9.17</u> shall survive the Closing or the termination of this Agreement.  The parties agree that venue shall lie in any state or federal court located within the State of Colorado.

9.18    <u>Special District Disclosure Statement</u>. SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS.  PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND EXCESSIVE TAX BURDENS TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICT TO DISCHARGE SUCH INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES.  PURCHASERS SHOULD INVESTIGATE THE DEBT FINANCING REQUIREMENTS OF THE AUTHORIZED GENERAL OBLIGATION INDEBTEDNESS OF SUCH DISTRICT SERVICING SUCH INDEBTEDNESS, AND THE POTENTIAL FOR AN INCREASE IN SUCH MILL LEVIES.

## SECTION 10
## ESCROW PROVISIONS

10.1    <u>Escrow Account and Notice</u>.  The Earnest Money and Purchase Price (collectively, the "<u>Escrow Payments</u>") shall be held in escrow in a separate interest-bearing money market or bank account by Escrow Agent until the earliest of (a) the Closing, on which date the Escrow Payments shall be released to Seller; (b) five Business (5) days after Escrow Agent shall have delivered to the non-sending party a copy of the notice sent by Seller or Purchaser stating that this Agreement has been terminated and that the party so notifying Escrow

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

Agent is entitled to the Escrow Payments, following which period the Escrow Payments shall be delivered to the party who sent notice stating that it is entitled to the Escrow Payments; provided, however, that within such five (5) Business Day period, Escrow Agent does not receive either a notice containing contrary instructions from the non-sending party hereto or a court order restraining the release of all or any portion of the Escrow Payments in which event the Escrow Agent shall not release the Escrow Payments; or (c) a joint notice executed by Seller and Purchaser is received by Escrow Agent, in which event Escrow Agent shall release the Escrow Payments in accordance with the instructions therein contained.  Escrow Agent shall immediately deliver a duplicate copy of any notice received by it in its capacity as Escrow Agent to Seller and Purchaser.

       10.2   <u>Dispute Regarding Escrow Payments</u>.  In the event that (a) Escrow Agent shall have received a notice containing contrary instructions or a court order as provided for in <u>Section 10.1</u> hereof and within the time therein prescribed, or (b) any other disagreement or dispute shall arise between the parties hereto or resulting in adverse claims or demands being made for the Escrow Payments, whether or not litigation has been instituted, then and in any such event Escrow Agent shall refuse to comply with any claims or demands on it and continue to hold the Escrow Payments until Escrow Agent receives either (i) a written notice signed by both Seller and Purchaser directing the disposition of the Escrow Payments, or (ii) a final non-appealable order of a court of competent jurisdiction directing the disposition of the Escrow Payments, in either of which events Escrow Agent shall then dispose of the Escrow Payments in accordance with said direction.  Escrow Agent shall not be or become liable in any way to any person or entity for its refusal to comply with any such claims or demands until and unless it has received a direction of the nature described in (i) or (ii) above.  Upon the taking by Escrow Agent of any of the actions described in (i) and (ii) above, Escrow Agent shall be released of and from all liability hereunder except for its own willful misconduct or negligence.  Notwithstanding the foregoing provisions of this <u>Section 10.2</u>, Escrow Agent may, on written notice to Seller and Purchaser, take such affirmative reasonable steps as it may, at its option, elect in order to terminate its duties as escrow agent hereunder, including, but not limited to, the deposit of the Escrow Payments with a court of competent jurisdiction and/or the commencement of an action in interpleader.  Upon the taking by Escrow Agent of the actions described above, Escrow Agent shall be released of and from liability hereunder except for its own willful misconduct or negligence.

       10.3   <u>Limitation on Escrow Agent Liability</u>.  Escrow Agent shall not incur any liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper document in good faith believed by Escrow Agent to be genuine.  Escrow Agent has executed this Agreement solely to confirm that it is holding and will hold the Escrow Payments in escrow pursuant to the provisions of this <u>Section 10</u> and for no other purpose.

**SECTION 11**
**ENVIRONMENTAL MATTERS**

Each of the obligations of the parties set forth in this Section 11 shall survive the Closing.

<u>11.1</u>   <u>Definitions</u>.  The following terms used herein have the following meanings:

(a)      "Damages" shall refer to the following: (a) losses, costs, expenses, damages or liabilities resulting from any personal injury claims relating to any Environmental Matter; and/or (b) direct and proximate losses, liabilities, costs, expenses and claims, arising from requirements or obligations under Environmental Laws, including without limitation; (i) the cost of remediation of an environmental condition, including reasonable engineering and legal costs; (ii) costs associated with any order or request from a governmental agency relating to the environmental condition of the Property, including reasonable engineering and legal costs; (iii) costs incurred in defending any third-party action for reimbursement or contribution relating to the environmental condition of the Property, including reasonable engineering costs, legal fees and court costs; and (iv) any other costs incurred as a result of an order issued or requirement imposed by a governmental agency or officer relating to an Environmental Matter.  .

(b)      "Environmental Matters" shall mean and include any claim,  Damages, order, demand, requirement or liability either (i) regulated or arising under any Environmental Law, or (ii) caused by or relating to any Hazardous Materials or environmental contamination at, on, under, in, or emanating from the Property, including without limitation underground storage tanks.

(c)      "Environmental Laws" shall mean and include without limitation (i) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984, as now or hereafter amended (42 U.S.C. § 6901 et seq.), (ii) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, as now or hereafter amended (42 U.S.C. § 9601 et seq.), (iii) the Clean Water Act, as now or hereafter amended (33 U.S.C. § 1251 et seq.), (iv) the Toxic Substances Control Act, as now or hereafter amended (15 U.S.C. § 2601 et seq.), (v) the Clean Air Act, as now or hereafter amended (42 U.S.C. § 7401 et seq.), (vi) the Safe Drinking Water Act, (42 U.S.C. § 300f et seq.), (vii) all regulations promulgated under any of the foregoing, (viii) any local or Colorado law, statute, regulation or ordinance analogous to any of the foregoing, and (ix) any other federal, Colorado, or Eagle County or Avon law (including any common law) statute, regulation, or ordinance regulating, prohibiting, or otherwise restricting the pollution, protection of the environment or the use, storage, discharge or disposal of Hazardous Materials.

(d)      "Hazardous Materials" shall mean and include any substance, product matter, material, waste, solid, liquid, gas, or pollutant, the generation, storage, disposal, handling, recycling, release, treatment, discharge, or emission of which is regulated, prohibited, or limited under any Environmental Law, and shall also include, without limitation: (i) gasoline, diesel, diesel fuel, fuel oil, motor oil, waste oil, and any other petroleum hydrocarbons including any additives or other by-products associated therewith, (ii) asbestos and asbestos-containing materials in any form, and (iii) polychlorinated biphenyls.

11.2  Purchaser's Release of Seller.  Purchaser waives its right to recover from, forever releases and discharges Seller and any of Seller's agents, employees, or affiliates from, any and all demands, claims, liabilities, obligations, actions, suits, legal or administrative proceedings,

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

losses, Damages, penalties, fines, liens, assessments, judgments, deficiencies, costs or expenses whatsoever (including, without limitation, reasonable attorney fees, witness and consultant fees, arbitration fees and court costs), whether direct or indirect, known or unknown, foreseen or unforeseen that may arise on account of or result from the Environmental Matters or the presence of any Hazardous Materials on, in, under, upon, about, beneath, emanating or migrating to or from the Property, except if and to the extent such Environmental Matters or Hazardous Materials were a part of Seller's Knowledge and such matter or matters were known to Seller contrary to Seller's representation and warranty in Section 4.2.8.

IN WITNESS WHEREOF, Seller and Purchaser have executed and delivered this Agreement as of the Effective Date.

(Remainder of page intentionally blank; signature page follows)

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

SIGNATURE PAGE
TO
PURCHASE AND SALE
AGREEMENT
BETWEEN

**BBG HOLDING CORP.
AS
"SELLER"**

**AND**

**K CAPITAL, LLC
AS
"PURCHASER"**

**DATED AS OF FEBRUARY 6, 2020**

SELLER:

    BBG HOLDING CORP., a Colorado Corporation

By: _____

    Name:   Michele Evans

    Title:   President

PURCHASER:

    K Capital, LLC,
    a Minnesota limited liability company

By: _____

Name:   Mikhail Kaminski

Title:   Manager

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

## JOINER OF ESCROW AGENT

The undersigned: (a) acknowledges receipt of the Earnest Money and a copy of this Agreement; (b) agrees to act as Escrow Agent under the Agreement, (b) agrees to be the person responsible for reporting the transaction to the Internal Revenue Service under then-current Treasury Regulations, and (d) agrees to hold and disburse the Earnest Money in accordance with the provisions of this Agreement.

ESCROW AGENT:     Title Company of the Rockies

By: _____

Its: _____

Date of Execution by Escrow Agent:

_____ , _____

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

# EXHIBIT A

## LEGAL DESCRIPTION OF LAND

Lot 22, Block 1, according to the Official Plat – Town of Avon and Final Subdivision Plat,
Amendment No. 4,
Benchmark at Beaver Creek,
County of Eagle,
State of Colorado

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

## EXHIBIT B

## FORM OF DEED

## SPECIAL WARRANTY DEED

THIS DEED, made this _____ day of _____, 20___, between _____ and _____, of the County of _____, State of Colorado, Grantors, and _____, whose legal address is _____, of the County of _____, State of Colorado, Grantee;

WITNESSETH, That Grantors, for and in consideration of the sum of Less Than Five Hundred Dollars, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, have granted, bargained, sold and conveyed, and by these presents do grant, bargain, sell, convey and confirm, unto Grantee, and Grantee's heirs, successors and assigns forever, all the real property, together with all improvements, if any, situate, lying and being in the County of _____, State of Colorado, described on EXHIBIT A, consisting of _____ pages, attached hereto and by this reference incorporated herein; also known by street and number as: _____ ;

TOGETHER WITH all and singular the hereditaments and appurtenances thereto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and all the estate, right, title, interest, claim and demand whatsoever of Grantors, either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances;

TO HAVE AND TO HOLD the said premises above bargained and described with the appurtenances, unto Grantee, and Grantee's heirs, successors and assigns forever. Grantors, for Grantors and Grantors' heirs, successors and assigns, do covenant and agree that Grantors shall and will WARRANT AND FOREVER DEFEND the above bargained premises in the quiet and peaceable possession of Grantee, and Grantee's heirs, successors and assigns, against all and every person or persons claiming the whole or any part thereof, by, through or under Grantors except for those permitted exceptions listed on EXHIBIT B, consisting of _____ pages, attached hereto and by this reference incorporated herein and all other matters of record.

IN WITNESS WHEREOF, Grantor has caused this deed to be executed on the date set forth above.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

GRANTOR

Dated: _____, 20____      By:    _____

           Name:   _____

           Title:   _____

STATE OF _____)

                                       )   ss.

COUNTY OF _____)

       The foregoing instrument was acknowledged before me this _____ day of _____,

20___, by _____ of _____

_____.

     WITNESS my hand and official seal.

                                     _____

                                     Notary Public

     My Commission Expires:_____

[ S E A L ]

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

EXHIBIT A

TO

SPECIAL WARRANTY DEED


<u>LEGAL DESCRIPTION</u>

Lot 22, Block 1, according to the Official Plat – Town of Avon and Final Subdivision Plat,
Amendment No. 4,
Benchmark at Beaver Creek,
County of Eagle,
State of Colorado

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

EXHIBIT B

TO

SPECIAL WARRANTY DEED


<u>EXCEPTIONS TO WARRANTY</u>

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

## EXHIBIT C

**FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES**

**ASSIGNMENT AND ASSUMPTION OF LEASES**

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (the "Assignment") is made and entered into as of _____, 20___ (the "Effective Date"), by and between _____, a _____ ("Assignor"), and _____, a _____ ("Assignee").

RECITALS:

A.      Assignor and Assignee have entered into a Purchase and Sale Agreement dated as of _____, 20___ (the "Purchase Agreement"), pursuant to which Assignee has agreed to purchase certain real property more particularly described on Exhibit A attached hereto (the "Property") from Assignor.

B.      In connection with the transactions contemplated by the Purchase Agreement, the Assignor has agreed to assign to the Assignee all of its right, title and interest in, to and under those certain Leases described on Exhibit B attached hereto (collectively, the "Leases"), and Assignee desires to accept such assignment and assume the obligations of Assignor under the terms of the Lease and subject to the conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

Assignor and Assignee agree as follows:

1.      Assignment.  Effective as of the Effective Date, Assignor hereby assigns, transfers, conveys and sets over to Assignee all of Assignor's right, title and interest in and to the Leases.

2.      Acceptance.  Assignee hereby accepts the assignment of the Leases and agrees to assume, keep, perform and fulfill all liabilities and obligations of the landlord under the Leases which accrue from and after the Effective Date.

3.      Assignee's Indemnification.  Assignee hereby indemnifies, protects, defends and holds Assignor, Assignor's members, the partners, officers, directors and shareholders of Assignor's members, and their respective successors, and assigns, harmless from any and all claims, damages, losses, suits, proceedings, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Losses"), both known or unknown, present and future, at law or in equity, arising out of, by virtue of or in any way related to the breach by Assignee of (or Assignee's failure to timely perform) any or all of the obligations imposed on the lessor or the landlord under the Leases, which obligations accrue as a result of events first occurring from and after the date of the Closing.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

4.      <u>Assignor's Indemnification</u>.  Assignor hereby indemnifies, protects, defends and holds Assignee and its partners, officers, directors and shareholders and all of their respective successors and assigns harmless from any and all Losses, both known and unknown, present and future, at law or in equity and arising out of, by virtue of, or related in any way to, the breach by Assignor of (or Assignor's failure to timely perform) any or all of the obligations imposed on the lessor or the landlord under the Leases, which obligations accrue as a result of events first occurring on or prior to the date of the Closing.

5.      <u>Binding Effect</u>.  This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.      <u>No Modification</u>.  This Assignment shall not be altered, amended or otherwise modified, except as set forth in a written document executed by the parties hereto.

7.      <u>Governing Law</u>.  This Assignment and all questions arising in connection herewith shall be governed by and construed in accordance with the internal laws of the State of Colorado.

8.      <u>Counterparts; Facsimiles</u>.  This Assignment may be executed in two or more counterparts, all of which shall be read together and be construed as one instrument.  A facsimile copy of a signature shall be as binding as an original signature.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

*[Signatures follow on next page]*

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

Assignor:

                    _____ ,

                a  _____

                By:   _____

                Name: _____

                Title: _____

Assignee:

                    _____ ,

                a  _____

                By:   _____

                Name: _____

                Title: _____

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

## EXHIBIT D

**FORM OF ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS, PERMITS AND WARRANTIES**

**ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS, PERMITS AND WARRANTIES**

THIS ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS, PERMITS AND WARRANTIES (this "Assignment") is made and entered into as of _____, 20___ (the "Effective Date"), by and between _____, a _____ ("Assignor"), and _____, a _____ ("Assignee").

## RECITALS

A. Assignor and Assignee have entered into a Purchase and Sale Agreement dated as of _____, _____ (the "Purchase Agreement"), pursuant to which Assignee has agreed to purchase certain real property more particularly described on Exhibit A attached hereto, and certain personal property related thereto, (collectively, the "Property") from Assignor.

B. In connection with the transactions contemplated by the Purchase Agreement, Assignor has agreed to assign all of its right, title and interest, if any, in, to and under the service and maintenance contracts, equipment leases and other contracts regarding the Property listed on Exhibit B attached hereto (collectively, the "Service Contracts") to Assignee.

C. In connection with the transactions contemplated by the Purchase Agreement, Assignor has agreed to assign all of its right, title and interest, if any, in, to and under all licenses or approvals issued under applicable law, permits, certificates of occupancy and franchises related to the Property (collectively, the "Permits") to Assignee.

D. In connection with the transactions contemplated by the Purchase Agreement, Assignor has agreed to assign all of its right, title and interest, if any and to the extent assignable, in, to and under all unexpired warranties and guaranties with respect to the Property, and any labor or materials furnished to the same, and benefiting the Assignor or the owner of the Property (collectively, the "Warranties") to Assignee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1. **Assignment**. Effective as of the date hereof, Assignor hereby assigns, transfers, conveys and sets over to Assignee all of Assignor's right, title and interest, if any, in the Service Contracts, Permits and Warranties, but only to the extent assignable or transferable. Assignor shall indemnify, defend and hold Assignee harmless from and against any and all demands, claims, losses, damagers, liabilities, costs or expenses of any kind or character (including reasonable attorneys' fees and charges) accruing under the Service Contracts before the Effective Date hereof.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

2.      <u>Acceptance</u>.  Assignee hereby accepts the assignment of the Service Contracts, Permits and Warranties and agrees to assume, keep, perform and fulfill all liabilities and obligations of Assignor which accrue under the Service Contracts, Permits and Warranties from and after the Effective Date.  Assignee shall indemnify, defend and hold Assignor harmless from and against any and all demands, claims, losses, damages, liabilities, costs or expenses of any kind or character (including reasonable attorneys' fees and charges) accruing under the Service Contracts after the Effective Date hereof

3.      <u>Binding Affect</u>.  This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

4.      <u>No Modification</u>.  This Assignment shall not be altered, amended or otherwise modified, except as set forth in a written document executed by the parties hereto.

5.      <u>Governing Law</u>.  This Assignment and all questions arising in connection herewith shall be governed by and construed in accordance with the internal laws of the State of_____.

6.      <u>Counterparts; Facsimiles</u>.  This Assignment may be executed in two or more counterparts, all of which shall be read together and be construed as one instrument.  A facsimile copy of a signature shall be as binding as an original signature.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Assignment in one or more counterparts, all of which such counterparts shall be read together and be construed as but one and the same instrument, as of the Effective Date.

*[Signatures follow on next page]*

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

Assignor:                          _____ ,

a _____

By: _____

Name: _____

Title: _____

Assignee:                         _____ ,

a _____

By: _____

Name: _____

Title: _____

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

<u>**EXHIBIT E**</u>

**FORM OF BILL OF SALE**

Seller, _____, a _____, in consideration of Ten and No/100 Dollars ($10.00), receipt of which is hereby acknowledged does hereby sell, assign, transfer and set over to Purchaser, _____, a _____ , all of Seller's right, title and interest in and to the following described personal property (collectively, the " Personal Property"), to wit:

> All of the furniture, equipment, machines, apparatus, supplies and personal property, of every nature and description, <u>if any</u>, owned by Seller and located in or on or used exclusively in relation to the real estate commonly known as "_____", _____County, _____, which real estate is legally described on <u>Exhibit "A"</u> attached hereto and made a part hereof, excepting therefrom the following:  (a) any fixtures, furniture, furnishings, equipment or personal property, if any, of tenants occupying the improvements situated on the real estate; (b) any fixtures, furniture, furnishings, equipment or personal property, if any, owned and used by the Property Manager (as such term is defined in the Agreement) at the real estate; and (c) fixtures, equipment, and machines, if any, leased by Seller under any leases or other agreements assigned to Purchaser.

TO HAVE AND HOLD the same unto the said Purchaser, its successors and assigns forever. Seller does hereby warrant and represent to Purchaser that Seller is the lawful owner of the Personal Property and has good and marketable title to the Personal Property free and clear of all liens, claims and encumbrances.  Seller, for itself and its successors and assigns, covenants and agrees to warrant and defend the title of the Personal Property unto the Purchaser, its successors and assigns, against all lawful claims.  Subject in all respect to the representations and warranties of Seller contained in the Purchase and Sale Agreement between Purchaser and Seller dated _____, 2020 (the "Agreement") and in this Bill of Sale, which shall be in full force and effect regardless of the following, this transfer is made without representation, warranty or guaranty by, or recourse against, Seller of any kind whatsoever.  Further, any implied warranties of quality, fitness or merchantability are hereby disclaimed.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be signed and sealed in its name by its officers thereunto duly authorized this _____ day of _____, 20__.

Assignor:      _____ ,

            a _____

 

            By:   _____
            Name: _____
            Title: _____

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

## EXHIBIT F

## FORM OF FIRPTA AFFIDAVIT
## TRANSFEROR'S CERTIFICATION OF NON-FOREIGN STATUS

To inform _____, a _____
("Transferee"), that withholding of tax under Section 1445 of the Internal Revenue Code of
1986, as amended (collectively, the "Code"), will not be required for transfer of certain real
property to Transferee by _____, a _____ ("Transferor"), the
undersigned hereby certifies the following on behalf of Transferor:

1.      Transferor is not a foreign person, foreign corporation, foreign partnership, foreign trust,
        or foreign estate (as those terms are defined in the Code and the Income Tax Regulations
        promulgated thereunder);

2.      Transferor's U.S. taxpayer identification number is as follows:  _____.

3.      Transferor's office address is as follows:

        _____
        _____
        _____

4.      Transferor is not a "disregarded entity" as defined in IRS Regulation 1.1445-2(b)(iii).

Transferor understands that this Certification may be disclosed to the Internal Revenue Service
by Transferee and that any false statement contained herein could be punished by fine,
imprisonment, or both.

Transferor understands that Transferee is relying on this Certification in determining whether
withholding is required upon said transfer.

Under penalty of perjury I declare that I have examined this Certification and to the best of my
knowledge and belief it is true, correct and complete, and I further declare that I have authority
to sign this document on behalf of Transferor.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

Date: _____, 20__

TRANSFEROR:      _____ ,
           a _____

By: _____
Name: _____
Title: _____

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

## EXHIBIT G

**FORM OF TENANT NOTICE**

**_____, 20____**

Re: _____

This is to notify you that _____, a _____ ("<u>Seller</u>"), has sold its interest in the property described above and in connection therewith has assigned its interest as landlord under your lease to _____, a _____ ("<u>Purchaser</u>").

You are further notified that any refundable security deposits or any prepaid rents under your lease have been transferred to Purchaser.

Commencing as of _____, all rental payments under your lease should be paid to Purchaser or as Purchaser shall direct.  Please make your rent checks payable to "_____" at the following address

_____

_____

_____

Any written notices you desire or are required to make to the landlord under your lease should hereafter be sent to Purchaser at the above address, with a copy at the same time to the following address:

c/o

_____

_____

Attention: _____

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

Very truly yours,

SELLER:                                          PURCHASER:

a _____                a _____

By: _____             By: _____
Name: _____               Name: _____
Its: _____              Its: _____

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

# EXHIBIT H

## FORM OF ESTOPPEL CERTIFICATE

## ESTOPPEL CERTIFICATE OF TENANT

_____

_____

_____

Attention: _____

Re:   Lease dated _____, \_\_\_\_ between _____, a Colorado limited liability limited partnership or its predecessor in interest ("Landlord") and \_\_\_\_ _____("Tenant") for Suite \_\_ (the "Premises") located at _____(the "Property")

Ladies and Gentlemen:

The undersigned, the Tenant under the referenced Lease, hereby certifies and confirms to and agrees with _____, and its successors and assigns (collectively, "Purchaser"), and any lenders of Purchaser and their respective participants, successors and assigns (collectively, "Lenders") and Landlord as follows:

1.      A true, correct and complete copy of the lease Tenant has entered into and all amendments to the lease and all other agreements modifying or supplementing the lease are attached hereto as Exhibit 1 and incorporated herein by reference (collectively, the "Lease"). The Lease is the sole agreement between Landlord and Tenant relating in any way to the Premises and the Property, and there are no other agreements, oral or written, between Landlord and Tenant relating to the Premises or the Property.  Landlord has not agreed to waive compliance by Tenant with any provision of the Lease.

2.      The Lease is in full force and effect. The term of the Lease commenced on _____, \_\_\_\_, and shall expire on _____, _____.

3.      The current Base monthly rent under the Lease is $_____, and Tenant has paid rent under the Lease through and including _____, 20\_\_.

4.      The amount of the security deposit being held by Landlord is $_____.

5.      No monetary obligations of Tenant under the Lease, including, without limitation, rent have been prepaid.

6.      The Landlord has fulfilled all of its obligations under the Lease to date, including without limitation (i) completion of the improvements and the space required to be completed by

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

Landlord to date according to the Lease in accordance with the plans and specifications therefore approved by Tenant and (ii) all Tenant finish and other construction costs or allowances payable by Landlord have been paid and no such costs are payable hereafter under the Lease.  Landlord has satisfied all commitments, arrangements and understandings made to induce Tenant to enter into the Lease.

7.      There are no existing defenses which Tenant has against enforcement of the Lease by Landlord.  There exists no default under the Lease.  No controversy or dispute exists between Landlord and Tenant.  Tenant's interest under the Lease has not been assigned, by operation of law or otherwise, and no sublease, concession agreement or license covering the Premises or any portion thereof has been entered into by Tenant.

8.      Landlord has not granted to Tenant any free rent periods or tenant improvement contributions under the Lease, and Landlord is not reimbursing Tenant or paying Tenant's rent obligations under any other lease, except:_____

_____.
(None unless otherwise indicated.)

9.      Tenant has no options to expand, or extend the term of the Lease, or an option or preferred right or right of first refusal to purchase any portion of the Property except:_____.
(None unless otherwise indicated.)

10.      There are no actions, whether voluntary or otherwise, pending against Tenant under the bankruptcy laws of the United States or any state thereof.

The undersigned understands that Purchaser or its assigns is acquiring the Premises and Lenders will make a mortgage loan secured by the Premises, each in reliance upon the certifications and agreements set forth herein, and agrees that Purchaser and Lenders, and their respective successors and assigns may rely upon the certifications and agreements for that purpose.

*[Signature on Following Page]*

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

**IN WITNESS WHEREOF**, the undersigned Tenant has executed and delivered this Estoppel Certificate as of the _____day of _____, 20____.

a _____

_____

By: _____

Name: _____

Title: _____

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

## EXHIBIT I

## FORM OF EVANS CHAFFEE LEASE AMENDMENT

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "Amendment") is made to be effective as of _____, 20__ (the "Effective Date") by and between BBG HOLDING CORP., a Colorado corporation ("Landlord") and EVANS CHAFFEE CONSTRUCTION GROUP, INC., a Colorado corporation ("Tenant").

## RECITALS

A.    Landlord and Tenant are parties to that certain Lease dated _____, 20__ (the "Lease"), for certain Unit(s) located at 77 Metcalf Road, Avon, Colorado, as such premises are more particularly described in the Lease.

B.    Tenant and Landlord desire to change the term of the Lease subject to the modifications set forth in this Amendment.

NOW, THEREFORE, in consideration of the covenants herein contained and of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    <u>Amended Term</u>.  The term of the Lease is hereby amended to expire sixty (60) months from and after the earlier of March 9, 2020 or the Effective Date hereof.

2.    <u>Effectiveness of Remainder of Lease</u>.  Tenant hereby affirms and reaffirms all of the terms and conditions of the Lease as amended hereby, and Tenant hereby affirms and reaffirms that the provisions of the Lease that are not changed, altered or amended by this Amendment remain in full force and effect.  In the event of any conflict between this Amendment and the terms of the Lease the terms of this Amendment shall control.

3.    <u>Binding Effect</u>.  This Amendment shall be binding upon and inure to the benefit of the parties and their respective personal representatives, successors and permissible assigns.

4.    <u>Authorization</u>.  Tenant represents and warrants that the execution and delivery of this Amendment has been authorized by all necessary action on the part of Tenant and constitutes the valid, binding and enforceable obligation of Tenant.

5.    <u>Cross References</u>.  All references to the Lease in any document executed in connection with the Lease shall refer to the Lease as amended by this Amendment.

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

6.      <u>Entire Agreement</u>.     This Amendment constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes all negotiations, prior discussions or prior agreements and understandings relating to the subject matter of this Amendment.   No representation, warranty, covenant, agreement, promise, inducement or statement, whether oral or written, has been made by Landlord or Tenant that is not set forth in this Amendment or in the instruments referred to herein, if any, and neither Landlord nor Tenant shall be bound by or liable for any alleged representation, warranty, covenant, agreement, promise inducement or statement not so set forth.

7.      <u>Definitions</u>.     All capitalized terms used herein shall have the same meaning as set forth in the Lease, unless otherwise defined herein.

8.      <u>Paragraph Headings</u>.   The paragraph headings used herein are intended for reference purposes only and shall not be considered in the interpretation of the terms and conditions hereof.

9.      <u>Counterparts</u>.   This Amendment may be executed in any number of counterparts. All of the counterparts, when taken together, shall constitute one and the same instrument.   This Amendment may be delivered by facsimile or other similar electronic transmission, and a facsimile or similar transmission evidencing execution shall be effective as a valid binding agreement between the parties hereto.

[*Signatures on Following Page.*]

DocuSign Envelope ID: 899FE84C-87A1-4459-8C02-EF69A7F5B732

EXECUTED as of the date first set forth above.

**LANDLORD:**

BBG HOLDING CORP.,
a Colorado corporation

By: _____
Name:
Title:

**TENANT:**

EVANS  CHAFFEE  CONSTRUCTION  GROUP,
INC., a Colorado corporation

By: _____
Name:  Michele Evans
Title:   President