IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03268-MEH

BBG HOLDING CORP.,

     Plaintiff,

v.

K CAPITAL, LLC, and
MIKHAIL G. KAMINISKI,

     Defendants.

_____

## ORDER

_____

This lawsuit concerns a failed real estate transaction. At issue are Plaintiff's claims that K Capital, LLC (through its principal, Mikhail Kaminski,) breached the contract to buy its property or alternatively induced Plaintiff's reliance on false promises that it would buy the property. The parties tried this action to the Court on May 17 and 18, 2022. Based on the evidence admitted at the bench trial, the legal briefing, and pursuant to Fed. R. Civ. P. 52, the Court issues this Order containing its Findings of Facts and Conclusions of Law. The Court rules in Plaintiff's favor on its breach of contract claim and in Defendants' favor on Plaintiff's promissory estoppel claim.

## FINDINGS OF FACT

1.     Plaintiff BBG Holding Corp. is a Colorado corporation that does business in the State of Colorado as a real estate holding company. Michele Evans is one its three owners. She also is the corporation's president and day-to-day operations manager. ECF 72 at 40. Ms. Evans testified at the bench trial in the role of Plaintiff's representative and the one who on its behalf participated in the attempted property sale transaction at issue in this lawsuit. ECF 72 at 40-41.

2.      Plaintiff owns a commercial building located in Avon, Colorado. At the time of the bench trial, four tenants were renting space in that building. Plaintiff also has its own office there. ECF 72 at 40-42.

3.      Plaintiff decided to sell the building in September 2019. ECF 72 at 42. Plaintiff hired Jules Sherwood of Kenai Capital Advisors to sell the property. ECF 72 at 42-43, 189. Mr. Sherwood advised a sale price of $3,400,000.00, although the record is unclear whether a specific offer price was included in the listing. ECF 72 at 50, 191. Mr. Sherwood has professional experience handling multi-million-dollar commercial property sales. ECF 72 at 197, 221-222.

4.      Defendant Mikhail Kaminski describes himself as a real estate professional. ECF 70 at 97, 116. The Court found him to be a very bright witness (ECF 70 at 110) and someone who speaks plainly and intentionally (ECF 70 at 112-113). In addition, he proceeded with this transaction with the benefit of his own retained transactional attorney, Dan Wolf. ECF 70 at 20, 104-105; ECF 72 at 72, 137-138, 269. Mr. Kaminski incurred legal costs related to this transaction. ECF 70 at 98.

5.      The evidence suggests that Mr. Kaminski is familiar with the area where the property is located. Before 2020, a business partner of Steve Sendor (who would serve as K Capital, LLC's broker for the transaction at issue in this lawsuit) helped Mr. Kaminski with an attempted purchase of another local property. ECF 72 at 266. Mr. Dunn of Kresher Capital (who would serve as K Capital, LLC's lender for this transaction) provided Mr. Kaminski financing for an earlier attempted property purchase. ECF 70 at 34. At trial Mr. Kaminski denied that either he or K Capital, LLC ever had purchased any property before attempting this transaction (ECF 70 at 91), but the overall evidence suggests to the contrary. Moreover, later in his trial testimony, Mr. Kaminski expressly described himself as "a real estate professional," in the same vein as the two

2

brokers and Plaintiff. ECF 70 at 97, 116.

6.      Mr. Kaminski is the sole member and manager of Defendant K Capital, LLC, a business entity located in Minnesota. It is a real estate purchasing company that Mr. Kaminski uses to enter into contracts for the purchase and sale of real estate. ECF 70 at 75-77.

7.      K Capital, LLC retained NAI Mountain Commercial to represent it in negotiations to buy the property at issue in this lawsuit. The two signed no formal brokerage contract, although that is consistent with general practice. The letter of intent (which all parties signed) identified NAI Mountain Commercial as K Capital, LLC's broker, thereby signaling the brokerage relationship. ECF 70 at 7, 10; ECF 72 at 238. NAI Mountain Commercial regarded K Capital, LLC as its client, and it acted in the fiduciary role of K Capital, LLC's broker for purposes of this real estate transaction (ECF 72 at 239-241) for which it communicated with Mr. Kaminski as K Capital, LLC's representative (ECF 72 at 242; Plaintiff's Exhibit 41). Mr. Kaminski authorized NAI Mountain Commercial to act as the broker for this property purchase. ECF 70 at 78-79.  Steve Sendor was the individual from NAI Mountain Commercial who helped Mr. Kaminski. Mr. Sendor's business partner at NAI Mountain Commercial was Erich Schmidt who also had interactions with Ms. Evans and Mr. Kaminski. ECF 72 at 249.

8.      Generally speaking, NAI Mountain Commercial provided both brokerage and property management services at the time of this attempted property transaction. It provided property management services for Plaintiff's building. ECF 72 at 46. Indeed, Mr. Kaminski contacted NAI Mountain Commercial through the contact information from its leasing sign at the property. ECF 72 at 238. NAI Mountain Commercial obtained Plaintiff's permission to represent K Capital, LLC as its broker to buy the property. ECF 70 at 5, 8-9; ECF 72 at 238. Neither did K Capital, LLC object to NAI Mountain Commercial contemporaneously serving both it (as broker)

and Plaintiff (as property manager). ECF 70 at 79. Section 3.1.2 of the sales contract identified NAI Mountain Commercial as the building's property manager. Plaintiff's Exhibit 12.

9.      Mr. Kaminski expressed his interest in buying the property. That prompted NAI Mountain Commercial to contact Mr. Sherwood to begin negotiations. ECF 72 at 232.

10.     Plaintiff and K Capital, LLC expressed their initial agreed-upon terms in a letter of intent. Those terms included K Capital, LLC's offer of $3,300,000.00. Plaintiff's Exhibit 11; ECF 72 at 44-45. This was the first inquiry by a potential buyer that resulted in the drafting of a letter of intent. ECF 72 at 106, 220.

11.     From there the parties proceeded to draft the actual Purchase and Sale Agreement ("PSA). Plaintiff's attorney negotiated with Mr. Kaminski's attorney and drafted the PSA. ECF 72 at 45. The PSA is found in the record as Plaintiff's Exhibit 12. There is no dispute that (1) both parties entered the PSA; (2) its effective date was February 6, 2020; (3) it accurately reflects the parties' intent; and (4) it created a binding agreement between them. Upon entering the PSA, Mr. Sherwood removed the property from the market and listed it as "under contract." ECF 72 at 60, 195-196.

12.     Title Company of the Rockies served as the escrow agent for the transaction. Plaintiff' Exhibit 12 at § 2.1.1. The PSA set March 24, 2020 as the closing date, and it created a series of preliminary deadlines and steps in advance of closing and transferring ownership.

13.     The first step was for K Capital, LLC to deposit $25,000.00 in earnest money with the escrow agent. Plaintiff' Exhibit 12 at § 2.1.1. However, should "Purchaser does not deposit the Earnest Money with Escrow Agent by such date," then "[t]his Agreement shall automatically terminate." *Id*.

14.     Both parties agree that the deadline for making the initial deposit was Thursday,

February 13, 2020. ECF 69 at ¶ 20(i); ECF 71 at ¶ 46. On the morning of February 11, 2020, Mr. Schmidt at NAI Mountain Commercial forwarded an email from the escrow agent to Mr. Kaminski containing instructions on how to pay the deposit by wire transfer. ECF 72 at 254; Plaintiff's Exhibit 40. Mr. Kaminski quickly responded that he was "gonna just run a check over there." Mr. Schmidt advised him to deliver the payment a few days early if he planned to pay by check. At 1:00 p.m. on February 13, 2020, Mr. Schmidt asked Mr. Kaminski if he had delivered the earnest money payment to the escrow agent. Mr. Kaminski answered that it "[w]ill be there this afternoon." At 11:00 a.m. on the morning of February 14, 2020, Mr. Sendor asked Mr. Kaminski if he had delivered the deposit. Mr. Kaminski explained that he remained "on bed rest mostly but I believe it was dropped today." ECF 40.

15.     The parties do not dispute K Capital, LLC's failure to make that deposit timely on or before February 13, 2020. Nor is there any dispute that the failure was sufficient to trigger the PSA's automatic termination provision.

16.     K Capital, LLC did not comply with § 2.1.1. However, on the next day, Friday, February 14, 2022, Mr. Kaminski delivered to the escrow agent a check in the amount of $25,000.00. Ms. Evans testified that the delayed payment caused her "absolutely no concern." ECF 72 at 65. She learned from Mr. Sherwood that Mr. Kaminski had reported "some sort of personal issue [as the reason] why he couldn't drop it off on the 13th, and that he was going to drop it off the next day." ECF 72 at 66-67. The Court observes that Mr. Kaminski frequently blamed delays on ill health.

17.     NAI Mountain Commercial did not proceed as if the contract had terminated. ECF 72 at 256. Nor did NAI Mountain Commercial communicate to Mr. Sherwood that the PSA contract had terminated at the end of the day on February 13, 2020. ECF 72 at 197.

18.     The $25,000.00 check was in the name of K Capital, LLC (Check No. 6135) and signed by Mr. Kaminski. ECF 70 at 80. Mr. Kaminski testified at trial that he did not intend for that money to go toward the PSA's earnest money deposit requirement. His understanding at that time, he explained, was that the PSA had terminated. He wrote the check "as a deposit to title" instead for the purpose of securing a contract amendment. ECF 70 at 81, 84, 109. At his deposition, by contrast, Mr. Kaminski testified that Check No. 6135 was intended as payment of the PSA's first earnest money deposit. ECF 70 at 82.

19.     The bank returned Check No. 6135 for insufficient funds. ECF 70 at 95-96.

20.     Mr. Kaminski signed a second check (Check No. 6138) drawn on K Capital, LLC's account. ECF 70 at 83. He paid by corporate check drawn from that account contrary to instructions to use a cashier's check. ECF 72 at 256; Plaintiff's Exhibit 41 at 12. The check was dated Tuesday, February 25, 2020. Plaintiff's Exhibit 14. Plaintiff's mother delivered the check to the escrow agent on her way driving through the area (from Vail to Beaver Creek). ECF 70 at 111, 123. At trial Mr. Kaminski repeated that he had made this payment as a step towards later requesting the PSA's amendment rather than as payment of the first earnest money deposit as required by the contract. ECF 70 at 86-87. By contrast, Mr. Kaminski had answered an interrogatory about "why [he had written] and signed check number 6138 for $25,000.00, to Title Company of the Rockies on February 25th, 2020" by explaining, "[b]ecause they gave me more time, and we were back on track." ECF 70 at 100. At trial, he explained that he meant "back on track" in the sense of amending the contract. ECF 70 at 100.

21.     Check No. 6138 was returned for insufficient funds on Friday, February 28, 2020 (Plaintiff's Exhibit 47 at 14) as the result of Mr. Kaminski's stop-payment request to his bank

(ECF 70 at 124). At trial Mr. Kaminski denied any intention to write bad checks.[1] He attributed it to simply grabbing the wrong checkbook (regarding the first check) and to his mother making the same mistake (regarding the second one). ECF 70 at 110-111. The record evidence shows that K Capital, LLC's bank rejected eight of its checks for insufficient funds that it processed during this same period of time. ECF 70 at 127-133. Mr. Kaminski attributed them to the same reason: that he had the wrong checkbook with him. *Id.*

22.     K Capital, LLC retained Kresher Capital, LLC to finance the purchase. Kresher Capital, LLC is a private, non-bank lender, and Patrick Dunn is its director. ECF 70 at 32. The retainer agreement required K Capital, LLC to make a $10,000 good faith deposit, for which Plaintiff delivered a check on February 27, 2020. ECF 70 at 36; Plaintiff's Exhibits 27 & 30. The check (Check No. 6137) was drawn on K Capital, LLC's account and signed by Mr. Kaminski (the same as the preceding two checks). It was for a total of $20,000.00 for two transactions, the one at issue in this lawsuit and a separate "Stone Creek" transaction. ECF 70 at 74; Plaintiff's Exhibit 46 at 40. The bank returned that check for insufficient funds. Plaintiff's Exhibit 47 at 12.

23.     Despite the fact that no earnest money actually was on deposit with the escrow agent, all parties proceeded as if the PSA remained in full force and effect. K Capital, LLC proceeded with its due diligence inquiries (ECF 70 at 89), the next step in the process of completing the sale.

24.     The contract gave K Capital, LLC thirty days to obtain and review due diligence documents and to inspect the building's condition and suitability. The deadline to complete due

---

[1] Technically speaking, the fact that the bank returned the checks is immaterial. K Capital, LLC's purported payment of the earnest money deposit constitutes valid consideration on its part, even if the bank returned those checks for insufficient funds. *Esecson v. Bushnell*, 663 P.2d 258, 260 (Colo. App. 1983).

diligence and inspection activities was March 9, 2020. Plaintiff's Exhibit 12 at § 3.1.1; Plaintiff's Exhibit 20. K Capital, LLC had the right "to terminate this Agreement on or before" March 9, 2020 "for any or no reason." Thereupon, K Capital, LLC would be refunded the earnest money, and "neither party shall have any liability to the other except for obligations which expressly survive termination." Plaintiff's Exhibit 12 at § 3.1.1.

25.     During the due diligence contingency time period, K Capital, LLC's broker, Mr. Sendor, gathered information about the building from Plaintiff and provided it to K Capital, LLC and Mr. Kaminski. ECF 72 at 244, 246, 251; Plaintiff's Exhibit 38; Plaintiff's Exhibit 41 at 6. This included "estoppel statements" from the building's tenants confirming information about the status of their respective leases. ECF 72 at 62-63; Plaintiff's Exhibit 30. Plaintiff provided a wide range of additional records about the property (ECF 72 at 51, 198; Plaintiff's Exhibit 21) that included commercial information Plaintiff regarded as confidential (ECF 72 at 52-53). Confidentiality was of special importance to Plaintiff because Mr. Kaminski was contemporaneously seeking to buy another commercial property in the area. ECF 72 at 58. Plaintiff purchased a title commitment and delivered it to K Capital, LLC for inspection. ECF 70 at 27-28; ECF 72 at 52-54, 174, 185-186, 188, 235. Plaintiff provided this information to comply with its contractual obligations. ECF 72 at 199-200. Mr. Sendor recalled no issue or complaint by Mr. Kaminski about not receiving due diligence investigatory information. ECF 72 at 244-245. Mr. Sendor added that from his perspective, the emerging COVID pandemic was not a source of concern that adversely affected the deal. ECF 70 at 13-14.

26.     On February 27, 2020, Mr. Dunn conferred with K Capital, LLC's broker about conducting an on-site visit. Plaintiff's Exhibit 30. Mr. Dunn informally visited the property. His conversations with Mr. Kaminski led him to believe that K Capital, LLC was under contract to

buy the building. ECF 70 at 45. Indeed, when Mr. Dunn asked Mr. Kaminski to confirm his interest in the purchase (before Mr. Dunn undertook the extra effort to find a funding source as the now emerging COVID pandemic was beginning to reduce available liquidity), Mr. Kaminski answered, "all good lets keep going." Plaintiff's Exhibit 28 [sic]. With that assurance, Mr. Dunn secured funding to finance the purchase, and "[a]ll was back to normal." Plaintiff's Exhibit 29. Mr. Dunn decided to keep moving forward with financing past March 3, 2020. ECF 70 at 46-48; Plaintiff's Exhibit 29. It was Mr. Sendor's understanding that Mr. Kaminski was refinancing another property in the area, funds from which K Capital, LLC would apply towards the purchase of Plaintiff's property. ECF 72 at 258.

27.     K Capital, LLC provided no notice to any party of any intention to terminate the PSA pursuant to § 3.1.1. Mr. Kaminski never instructed his broker to terminate the PSA. To the contrary, Mr. Sendor was trying to keep the deal together for Mr. Kaminski's benefit. ECF 72 at 258. On February 27, 2020, Mr. Sendor emailed Mr. Kaminski to check on the status of proceedings; to remind him of the upcoming due diligence and second earnest money deposit deadlines; and to finalize financing arrangements with Kresher Capital. Mr. Sendor concluded the email by asking Mr. Kaminski if he was "feeling good about this deal" in the sense of moving forward with it past the due diligence period and onwards toward closing. ECF 72 at 259-263. Plaintiff's Exhibit 48.

28.     Mr. Kaminski responded to Mr. Sendor's inquiry in the affirmative. He was feeling good about the deal and wanted to proceed. He rejected Mr. Sendor's advice to terminate the contract until he could find the money to pay the deposit. ECF 70 at 18, 20; ECF 72 at 264. Indeed, on March 2, 2020, Mr. Kaminski emailed Mr. Sendor requesting him to obtain three specified tenant lease agreements for his lender. ECF 72 at 266-267. Plaintiff's Exhibit 36. Mr. Kaminski

also asked Mr. Sendor to arrange a personal meeting with Plaintiff (ECF 72 at 268) as well as indicated that he was changing lenders (ECF 72 at 268; Plaintiff's Exhibit 41 at 15).

29.     During this period of time, it was Ms. Evans' understanding that K Capital, LLC intended to complete the property purchase. ECF 72 at 70. Likewise, no one told Mr. Dunn that K Capital, LLC wanted to terminate the PSA. ECF 70 at 50-51. He assumed K Capital, LLC was under contract when he was working on the financing. ECF 70 at 52.

30.     However, as the due diligence contingency period neared its endpoint, the various parties involved in the transaction began to doubt K Capital, LLC's interest in following through. On March 3, 2020, Mr. Sendor informed Mr. Kaminski that his second check to the escrow agent also had bounced. Plaintiff's Exhibit 41 at 15. He accused Mr. Kaminski of "wasting people's time and money." *Id*.

31.     Mr. Kaminski saw no reason for Mr. Sendor "to be freaking out." As he saw it, the earnest money was still "soft." ECF 41 at 16. By that, Mr. Kaminski meant completely refundable through March 9, 2020 (as opposed to "hard" when it would convert to liquidated damages), Mr. Sendor explained at trial. ECF 72 at 270. Mr. Kaminski added that he could use the contract's five-day cure period to secure alternative financing. Plaintiff's Exhibit 41 at 16.

32.     Mr. Dunn had already started work on securing a loan for K Capital, LLC. ECF 70 at 38-45. On March 4, 2020, Mr. Dunn learned that the bank returned the check K Capital, LLC had written him to pay the good faith financing deposit for insufficient funds. When Mr. Dunn informed Mr. Kaminski that the check was bad, Mr. Kaminski answered, "that is weird, give me a call when your [sic] finished with your discussions and we can handle. Good Luck!!" Plaintiff's Exhibit 29.

33.     Mr. Sendor "felt, that at the minimum, [Mr. Kaminski was] not being honest with

[him]." Mr. Sendor wanted to avoid involvement in any possible fraud or other dishonest act by K Capital, LLC. ECF 70 at 18-19. Mr. Sendor doubted that Mr. Kaminski was engaging in "a good-faith effort to actually transact for the contract." ECF 70 at 19.  He suspected some sort of serious flaw behind Mr. Kaminski's pursuit of this deal. ECF 70 at 19-21.

34.     On March 3, 2020, Mr. Sendor fired Mr. Kaminski as NAI Mountain Commercial's client. Mr. Kaminski told Mr. Sendor to advise others to use him as the contact person for all future communications regarding the property purchase. Plaintiff's Exhibit 41 at 16. Later that same afternoon, Mr. Sendor informed Plaintiff's broker and others of the terminated agency relationship and the need to communicate with Mr. Kaminski directly. ECF 72 at 271; Plaintiff's Exhibit 15. Although Mr. Sendor had ended his brokerage relationship, he did not perceive the underlying deal as terminated. To the contrary, he "believe[d] that the contract was still alive." ECF 72 at 271-272. Nor did Mr. Sendor tell Mr. Sherwood that K Capital, LLC. was terminating the contract. ECF 72 at 271. Erich Schmidt of NAI Mountain Commercial informed Plaintiff's representative, Ms. Evans, that K Capital, LLC had not terminated the PSA and that Mr. Kaminski would be representing K Capital, LLC for this deal.

35.     Ms. Evans spoke with Mr. Schmidt when she learned that NAI Mountain Commercial had terminated K Capital, LLC as its client. Mr. Schmidt gave no details about the reasons for the termination. Ms. Evans also asked Mr. Schmidt if Mr. Kaminski remained interested in buying the property. Mr. Schmidt answered in the affirmative, explaining that Mr. Sherwood should contact Mr. Kaminski directly to proceed forward. ECF 72 at 76-77.

36.     Both Mr. Sherwood and Mr. Sendor agreed that it was unusual for a broker to terminate a client. A broker's act of firing a client does not necessarily terminate the deal, however. The client may continue with the transaction without a broker. Ultimately, it is the buyer's

prerogative to decide whether to terminate the deal. ECF 72 at 230. Indeed, Mr. Sendor asserted his right to a commission should the purchase still occur without him. ECF 70 at 22; ECF 72 at 233.

37.     Between March 3 and March 5 of 2020, Mr. Sherwood communicated directly with Mr. Kaminski about the status of the deal. Plaintiff's Exhibit 24. Mr. Kaminski informed him that K Capital, LLC wanted to move forward with the purchase. ECF 72 at 201; Exhibit 25. On March 4, 2020, Mr. Sherwood emailed Mr. Kaminski that he had undertaken steps to secure financing and was willing to "help make this deal happen." However, Mr. Sherwood "need[ed] transparency" and a $25,000.00 earnest money deposit. Plaintiff's Exhibit 25. Mr. Kaminski did not say the contract was terminated. ECF 72 at 208-209, 278.

38.     Mr. Sherwood also contacted Mr. Dunn at Kresher Capital, LLC. Mr. Dunn confirmed that Kresher Capital, LLC was performing its due diligence review of the deal.

39.     On March 4, 2020, the escrow agent informed Plaintiff's broker, Mr. Sherwood, that K Capital, LLC's second check for $25,000.00 (Check No. 6138) had bounced. Plaintiff's Exhibit 16.

40.     On March 4, 2020, Ms. Evans emailed Mr. Sherwood to express concern about paying more in attorney fees "to do the addendum in case [Mr. Kaminski] flakes." Defendant's Exhibit 34. Ms. Evans explained at trial that Mr. Sherwood was considering amending the PSA to reduce the total escrow deposit from $100,000.00 to $50,000.00 as a way to keep the deal on track. ECF 72 at 125-126, 169. Mr. Sherwood's response expressing "the probability of success using this current buyer" (Defendant's Exhibit 34) indicates that he and Ms. Evans believed that the deal remained on track. Ms. Evans confirmed that to be their understanding. ECF 72 at 130, 176. She believed that Plaintiff was proceeding in compliance with the PSA, and she "interpreted . . . the

actions of the buyer, K Capital, LLC, [as] also progressing with the transaction." ECF 72 at 145.

K Capital, LLC never gave notice of any default by Plaintiff. ECF 72 at 187.

41.     On March 9, 2020, Mr. Sherwood asked Mr. Kaminski for an update. Mr. Sherwood

complained that Mr. Kaminski has "only lied to [him] so far" in response to his requests for

information. Mr. Sherwood noted that Mr. Kaminski still had paid no deposit money to the escrow

agent or lender. Mr. Sherwood emphasized the need to communicate something of substance to

Plaintiff in order to keep the deal alive. Alternatively, he asked Mr. Kaminski whether he should

recommend that Plaintiff cancel the contract pursuant to its buyer default clauses. Mr. Kaminski

responded that he was unable to provide a substantive answer at that time but would contact him

on March 10. Mr. Sherwood repeated his request for an update about whether Mr. Kaminski

intended to proceed with the purchase. Plaintiff's Exhibit 26 at 3.

42.     The third step towards completing the sale involved payment of a second earnest

money deposit. If K Capital, LLC did not exercise its right to terminate the contract during the due

diligence contingency period, then he was required to deposit $75,000.00 with the escrow agent

(thereby raising the earnest money total to $100,000.00). The parties agree that the deadline for

making this second deposit was Monday, March 16, 2020. Plaintiff's Exhibit 12 at § 2.1.2. K

Capital, LLC did not make this payment.

43.     On Tuesday, March 10, 2020, Mr. Sherwood emailed Mr. Kaminski explaining that

he had been trying to reach him by telephone since the previous Friday without any response. Mr.

Sherwood wanted "to discuss where [Mr. Kaminski] was on the . . . transaction." Mr. Sherwood

reminded Mr. Kaminski that he still had not paid the initial $25,000.00 earnest money deposit

despite being given "more than five business days to cure that default." To proceed forward with

the purchase, Mr. Sherwood instructed Mr. Kaminski to deliver a cashier's check in that amount

to the escrow agent immediately. Because he had raised no objections during the due diligence inspection period, he further instructed Mr. Kaminski to deliver a cashier's check to the escrow agent by March 16, 2020 in the amount of $75,000.00 for the second earnest money deposit. Plaintiff's Exhibit 17. Ms. Evans authorized Mr. Sherwood to send that email, and a copy was sent to Plaintiff's attorney. ECF 72 at 71.

44.     On March 11, 2020, Mr. Kaminski informed Mr. Sherwood that he had to travel to Los Angeles to help his sister who had been in a car accident. On March 16, 2020, Mr. Sherwood again asked for an update on Mr. Kaminski's intention. Plaintiff's Exhibit 26 at 2. Neither K Capital, LLC nor Mr. Kaminski on its behalf made any earnest money deposit by the March 16, 2020 deadline.

45.     Section 7.2 contains the PSA's terms for how a seller may remedy a buyer's default. First, the seller must give the buyer written notice of its material default (defined as the failure to perform any of its obligations including required payments but excluding the obligation to proceed to closing). Upon receiving that notice, the buyer has five business days to cure the default. If the buyer leaves the default uncured, then the "Seller may terminate this Agreement by providing written notice of termination to Purchaser."

46.     Section 7.2 furthers that upon the seller's invocation of the above termination option, the "Seller shall be entitled to receive and retain the Earnest Money as liquidated damages (and not as a penalty or forfeiture) and as Seller's sole and exclusive remedy and relief hereunder (except for Surviving Obligations), the Earnest Money shall be automatically forfeited to Seller." The Seller obtains the escrow money deposit by demanding it in writing from the escrow agent.

47.     Section 7.2 also provides justification for using the earnest money deposit as liquidated damages. The provision represents the parties' agreement that "the actual damages to

Seller that would result from [the Purchaser's default] would be extremely difficult to calculate or establish on the date [of the default]." It reflects their express, negotiated agreement "that the amount of the Earnest Money constitutes reasonable compensation to Seller for such failure by Purchaser and shall be disbursed to Seller as liquidated damages in the event of such failure by Purchaser." Another express purpose for the liquidated damages provision is to limit the buyer's potential liability to the seller should the buyer fail to fulfill its contractual obligations.

48.     After regular business hours on March 18, 2020, Plaintiff's attorney emailed Mr. Kaminski a copy of the demand letter that she would be placing in the mail on the next day. In that letter dated March 19, 2020, Plaintiff's attorney recalled how K Capital, LLC had "indicated to the Seller and the Seller's broker that [it] desired to proceed to Closing and continued discussions with the Seller in that regard." Nor had K Capital, LLC raised any title or due diligence objections. Despite those indications of its willingness to complete the transaction, K Capital, LLC had defaulted on the PSA's requirement to deposit a total of $100,000.00 in earnest money with the escrow agent. Plaintiff's attorney therefore demanded K Capital, LLC to cure that default by delivering to the Seller $100,000.00 by March 20, 2020 and to pay the remaining purchase price on March 24, 2020. Should K Capital, LLC fail to comply, Plaintiff would "exercise all rights available to it under law and equity to recover its damages." Plaintiff's Exhibit 18.

49.     Neither K Capital, LLC nor Mr. Kaminski on its behalf undertook any action to bring K Capital, LLC into compliance with the PSA. The parties did not proceed to closing and title to the property did not transfer to K Capital, LLC. ECF 72 at 153.

50.     At trial, Mr. Kaminski admitted to engaging in actions such as securing lending and statements made to Mr. Sherwood that were consistent with moving towards purchasing the property. He explains that he did so with *the intent of amending the PSA*, even if he "was not clear"

about articulating that intention to the others. ECF 70 at 95. Indeed, he never actually instructed or requested a contract amendment (although he did speak with his attorney about the matter). ECF 70 at 101-102. Mr. Kaminski also admitted that he never notified the other parties that he was exercising his right to terminate the contract. He assumed that the automatic termination provision of § 2.1.1, which caused the PSA to terminate at the end of the day on February 13, 2020, rendered any subsequent termination notification unnecessary. ECF 70 at 96-97. Nor did he see any practical reason to inform the brokers of his belief that the PSA had terminated because:

> They are both real estate professionals[.] I would have assumed they read the full contract. They are both in this business, where the contract sometimes gets screwy, and the deal still gets done.

ECF 70 at 97, 101. He assumed the same of Plaintiff whom he described as "the president of a three-million-dollar company." Id.

51.    Promptly after K Capital, LLC failed to bring itself into compliance with the PSA, Mr. Sherwood relisted the property and placed it back on the market for sale. ECF 72 at 83, 216. By this point, the commercial property market was trending downward. ECF 72 at 216. Plaintiff received no inquiries near the $3,300,000.00 that K Capital, LLC had offered. ECF 72 at 83, 90, 216-217. In December 2020, two of the property's tenants did not renew their leases, and in April 2021, a third tenant—the property's largest—also departed. ECF 72 at 83. Overall demand in renting office space was waning, making it difficult for Plaintiff to find replacement tenants. ECF 72 at 85.

52.    Plaintiff claims costs incurred as the result of its effort to sell the property to K Capital, LLC. Ms. Evans testified that Plaintiff paid between $6,500.00 to $7,000.00 in legal fees related to the negotiation and drafting of the PSA. ECF 72 at 85. This Court notes that in an email dated March 4, 2020, Ms. Evans said her attorney fee bill for February was $6,500.00. Defendant's

Exhibit 34. Plaintiff paid the property manager $650 to obtain the tenant estoppels. ECF 72 at 62, 85. Ms. Evans claims an undetermined amount of time that she spent on the matter. ECF 72 at 85.

53.     Plaintiff still owns the property. Given the difficulty in finding new tenants, it is converting some of the space into residential units. Plaintiff has spent $1.6 million to complete that conversion. ECF 72 at 85, 90.

## ANALYSIS

Plaintiff seeks relief under the theories of breach of contract and promissory estoppel. The burden of proof for both is by the preponderance of the evidence. *Hildebrand v. Wilmar Corp*., No. 19-cv-00067-RM-NRN, 2021 WL 4129453, at *4 (D. Colo. Sept. 10, 2021) (breach of contract); *Zick v. Krob*, 872 P.2d 1290, 1295 (Colo. App. 1993) (citing *Nicol v. Nelson*, 776 P.2d 1144, 1147 (Colo. App. 1989) (promissory estoppel)). As a general matter, "the burden of proof in any civil action shall be by a preponderance of the evidence." Colo. Rev. Stat. § 13-25-127(1). Plaintiff originally brought suit in Colorado state court. Defendants removed the civil action to this federal court in the District of Colorado.

## I.     Breach of Contract

There is no dispute that the PSA automatically terminated at the end of the day on February 13, 2020 pursuant to § 2.1.1. Plaintiff itself regards the contract as automatically terminated. ECF 31 at 5. Moreover, the contract's automatic termination already has been established as the law of the case. This Court ruled that "[u]nder the plain language of the PSA, it terminated on February 13, 2020" (ECF 27 at 4) and that "Defendants rightfully assert that the Agreement, by its provisions, terminated automatically upon their initial default" (ECF 41 at 5). This Court later affirmed "that the Agreement, by its provisions, terminated automatically under its own terms upon the initial default." ECF 58 at 2.

Plaintiff must establish the existence of a contract to allege its breach. *Hildebrand*, 2021 WL 4129453 at *4 (listing "the existence of a contract" as the first required element of the cause of action). Plaintiff relies on the doctrine of readoption to satisfy the first element. That requires Plaintiff to prove the parties' intention to revive the PSA contract and bring it back into force. Stated differently, the parties must have intended to ignore the automatic termination.

### A.    Readoption/Ratification

Defendants themselves recognize "readoption" as a principle of contract law. Citing *Tritch v. Norton*, 15 P. 680, 688 (Colo. 1887), they regard it as "well-settled that a contract is readopted if, after termination, the parties act in a way that is consistent with the previous contract's terms and conditions." ECF 31 at 5-6. This Court already has determined that despite the age of that opinion, the concept that parties may readopt a contract drawn from *Tritch* applies to this transaction. ECF 27 at 4-5. The Court cited *Emley v. Tenenbone*, 255 P. 627, 628 (Colo. 1927) for the equivalent concept of contract ratification. ECF 41 at 5. The Court already has found Plaintiff's claim of readoption or ratification plausible: "The parties' conduct here appears to establish a readoption of the PSA, whose express terms thereafter governed the parties' conduct." ECF 27 at 5. What remained was the disputed *fact* of whether "the actions and intent of the parties after the initial failure of the contract" constitutes readoption. ECF 41 at 5. The Court left the answer to that question for trial. ECF 58.

Having held that trial and heard the evidence, the Court finds the parties' conduct to manifest the intent to readopt the PSA and to bring it back into force despite the automatic termination. It was K Capital, LLC's non-payment of the initial earnest money deposit on the February 13, 2020 deadline that triggered § 2.1.1's automatic termination provision. While there is no dispute about the late payment, the parties regarded it as only a technical omission. In the

days leading up to the deadline, Mr. Kaminski represented to his broker that he in fact would be making the deposit. He missed that deadline, but only by one day. Mr. Kaminski attributed the delay to ill health. He did not intend for that check to bounce. Mr. Kaminski's comments and actions conveyed his intent to comply with § 2.1.1 in substance.

This Court highlights the context surrounding the contract's automatic termination because it lends insight into K Capital, LLC's subsequent conduct. K Capital, LLC continued forward with the transaction, following the roadmap that the PSA had created. Neither Mr. Kaminski (on K Capital, LLC's behalf) nor any other party involved in the transaction acted as if the contract no longer existed. The contract's automatic termination did not affect the parties' conduct. Mr. Kaminski made a second attempt to pay the earnest money with a check he believed his bank would honor. He sought due diligence materials and applied for a loan. Importantly, he expressly reassured his broker and lender of his intent and desire to buy the property. Moreover, he did so as someone who is intelligent, knowledgeable about commercial property transactions, and with the benefit of legal counsel. Mr. Kaminski did not communicate to the others that he was walking away from the deal, but rather, he reassured them that it remained on track. Both sides' brokers attempted to keep the deal alive for as long as they could. It was later when the other parties began to doubt Mr. Kaminski's true intent or ability.

Both Plaintiff and K Capital, LLC undertook acts that constitute partial performance of the PSA. As for K Capital, LLC, the only act that the PSA required of it through the end of due diligence research period was the payment of the initial earnest money deposit. Technically speaking, K Capital, LLC did not comply with it because the escrow agent never had that money actually on deposit. However, K Capital, LLC twice did attempt to make that deposit and in a way that portrayed to the others its good faith compliance. Moreover, Mr. Kaminski directed the

delivery of those two checks with his own subjective belief that the bank would honor them. At trial, Mr. Kaminski expressly denied knowingly and intentionally writing bad checks. Thus, the evidence shows K Capital, LLC's intention to perform that material term.

### B.   Waiver of Automatic Termination

Viewed from a different perspective, no party objected to the contract's continued application. In a previous ruling, this Court cited *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 372 (Colo. App. 1994) for the general rule that a party implicitly waives a contract term if (1) the party's conduct manifested an intent to relinquish the right or privilege that the term created or (2) the party's actions were inconsistent with the assertion of that contractually created right. ECF 27 at 5. "In general, a party may waive a contract provision where the party is 'entitled to assert a particular right, knows the right exists, but intentionally abandons that right." *Tarco, Inc. v. Conifer Metro. Distr.*, 316 P.3d 82, 89 (Colo. App. 2013) (citing *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 919 (Colo. App. 1991)). To support a finding of implicit waiver, the party's conducting "must be free from ambiguity and clearly manifest the intention not to assert the benefit." *Tarco*, 316 P.3d at 89 (citing *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)); *see also In re Autterson*, BAP Nos. CO-14-063 and -064, 2015 WL 6789168, at *4-6 (10th Cir. 2015). The Court has already ruled that Plaintiff waived the ability to base a breach a contract claim on K Capital, LLC's payment of that earnest money deposit with a bad check. ECF 27 at 5. This is because Plaintiff "continued by its course of conduct to proceed with the PSA." *Id*. At issue here is whether the contract's automatic termination provision likewise was waived.

There are two ways to frame this question. The first is from Plaintiff's perspective. It asks whether Plaintiff waived the automatic termination provision as *its* remedy for K Capital, LLC's breach. The issue in *GJ&L, Inc. v. CNH Indus. Am., LLC*, No. CV 117-179, 2020 WL 1491771, at

*5-6 (S.D. Ga. Mar. 13, 2020) was whether a manufacturer waived a dealership's violation of a particular contract requirement "by not following through" on the contract's automatic termination provision. The court left that question for the jury to decide. Implicit in its ruling is that the waiver doctrine can apply in the automatic termination context. The evidence in this case shows that Plaintiff waived its right to invoke the PSA's automatic termination provision in response to K Capital, LLC's late earnest money payment.

The second way to view this issue is from K Capital, LLC's position. In this context, the question becomes whether K Capital, LLC waived the right to invoke the contract's automatic termination as a defense to Plaintiff's request for redress. This inquiry asks whether the termination of the contract *on the whole* can be waived. In *Slaughter-Cooper, M.D. v. Kelsey Seybold Med. Grp. PA*, 379 F.3d 285 (5th Cir. 2004), the Fifth Circuit explained that only an existing right may be waived. A contract that automatically terminated leaves nothing that can be waived, including the contract's provision that triggered the automatic termination in the first place. *Id.* at 290-91.

As *Slaughter-Cooper* itself emphasizes, it is the parties' intent that is paramount, 379 F.3d at 290, and the particular circumstances of the case show K Capital, LLC's intention to proceed forward with the transaction. In practical terms, K Capital, LLC ignored the contract's automatic termination. However, even if *Slaughter-Cooper* bars the application of the waiver doctrine in the automatic termination context, the readoption/ratification doctrine results in the same outcome. The parties revived the PSA either because they waived its termination or because they readopted it.

## C.    Amendment

Section 9.4 of the contract states that it "may be amended only by a written instrument executed by the party or parties to be bound thereby." Plaintiff's Exhibit 12 at 22. This Court

already has found this provision does not apply because "there was [not] any amendment here." ECF 27 at 5. In other words, no party sought *to change* any particular contract term. There is evidence that Mr. Sherwood may have proposed lowering the earnest money total from $100,000.00 to $50,000.00. However, it appears that Plaintiff resisted that option, and in any event, Plaintiff never expressed it to K Capital, LLC.

At trial, Mr. Kaminski used contract amendment to reconcile how his ongoing substantive actions towards completing the deal does not show contract readoption. He said his two attempts to pay the $25,000.00 earnest money deposit was not motivated by the intent to comply with the PSA. Rather, he used it to create some sort of status quo after which he could pursue a contract amendment. The evidence does not corroborate his assertion that he was acting with the subjective intent to seek the contract's amendment. All of his actions in furtherance of the transaction were in perfect alignment with the roadmap that the PSA already had created. Mr. Kaminski did not describe how he wanted to amend the PSA, and he certainly expressed no such intent to the others at the time. To the contrary, his words and actions signaled an intent to proceed with the PSA as is, rather than to change it in some way. Implicit in his testimony that he wanted to amend the PSA is the intention to proceed with the purchase. There is no need to amend a contract that no longer exists. If, as Defendants stress and Plaintiff concedes, the PSA did automatically terminate, then the only way to proceed forward would be either to revive it as the still valid expression of their intent or if its terms were not acceptable, to draft a whole new agreement.

Defendants' position relies heavily on the occurrence of the automatic termination that his late payment of the earnest money deposit caused. In practical effect, Defendants' position is that the contract's automatic termination gave K Capital, LLC the freedom to proceed with the transaction unilaterally on its own terms without any risk of contractual liability. If the doctrine of

contract readoption/ratification is ignored, Defendants may be correct. The parties simply would have been going through the motions of the contract. Plaintiff continued to participate in the process purely of its own accord. Plaintiff, the brokers, and the lender should have known they were preceding without a binding contract in place. However, the law does permit the revival of a terminated contract. Just as the parties' intent defines whether a contract formed in the first place, it also defines whether they restored it.

### D.      Summary Regarding the Existence of a Contract

The evidence does not support Defendants' position that (1) the PSA never came back into force after its automatic termination, (2) an express written amendment pursuant to § 9.4 was the only way to revive the contract, and (3) because there was no § 9.4 written amendment, there is no valid, enforceable contract between the parties. Rather, the parties' conduct reflects the intent to proceed with the PSA either by waiving the automatic breach or by restoring the PSA as their agreement post-termination. Consequently, the Court finds that the PSA was a binding contract between the parties, and thus, Plaintiff establishes the first element of a breach of contract claim.

### E.      Defendant's Failure to Meet Its Contractual Obligation

The next two elements of the cause of action are (2) Plaintiff's performance of the contract but (3) Defendant's failure to do so. *Hildebrand*, 2021 WL 4129453 at *4. Plaintiff performed its pre-closing obligations under the contract. K Capital, LLC, by contrast, did not. It "materially defaulted in the performance of any of its obligations under this Agreement other than its obligation to proceed to Closing," as § 7.2 provides, when it failed to pay the full $100,000.00 earnest money deposit. Because K Capital, LLC did not exercise its right to terminate the contract during the due diligence contingency period, § 2.1.2 required it to deposit $75,000.00 with the escrow agent in addition to the $25,000.00 that already was outstanding (thereby raising the earnest

money total to $100,000.00). The parties agree that K Capital, LLC did not make this payment by the March 16, 2020 deadline. Nor did K Capital, LLC cure that default despite being given the opportunity to do so.

### F.     Remedy

The fourth—and final—element of the claim requires Plaintiff to have suffered damages as a result of the breach. *Hildebrand*, 2021 WL 4129453 at *4. Plaintiff does not seek specific performance of the contract. Plaintiff limits its request for relief to what the PSA permits at § 7.2, which is conversion of the total required earnest money into liquidated damages. One reading of § 7.2 is that Plaintiff may recover only what is actually on deposit with the escrow agent. Because the escrow agent has no money on deposit, there would be nothing for the escrow agent to transfer to Plaintiff. However, Defendants do not raise this argument. Nor does this Court construe § 7.2 so narrowly as to restrict Plaintiff's recovery only to what is actually on deposit with the escrow agent. Section 7.2 also could be read as using the earnest money total as the benchmark for calculating the amount of liquated damages for which a defaulting buyer is liable. That was the approach taken in *Esecson*, 663 P.2d at 261, in which the Colorado Court of Appeals enforced a liquidated damages clause even though the check that the buyer presented to pay the earnest money deposit was returned for insufficient funds.

This Court may enforce the agreed-upon $100,000.00 liquidated damages clause if it does not constitute a penalty. As a general rule, a court may not award liquidated damages if the amount is excessive in relation to the breach. *In re Market Ctr. E. Retail Prop., Inc*., 433 B.R. 335, 359 (D.N.M. 2010). Although $100,000.00 is a significant amount of money on its own, it is not when considered in the context of property contract at issue. It is only three percent of what K Capital, LLC offered to buy the property. Moreover, Mr. Kaminski (through whom K Capital, LLC acted)

is a self-described real estate professional who was (or should have been) knowledgeable about the commercial property buying process. Plaintiff's broker initially did not doubt K Capital, LLC's ability to pay the initial deposit because "[m]ost parties offering on a $3.3 million property have $25,000.00 to put up for earnest money." ECF 72 at 196. The total $100,000.00 deposit likewise is a comparatively insubstantial sum of money to a buyer of a multi-million-dollar property.

Additional factors support finding $100,000.00 to be a reasonable liquidated damages amount. Mr. Kaminski is a sophisticated actor who negotiated the contract with the additional benefit of legal counsel. By signing the contract on K Capital, LLC's behalf, Mr. Kaminski accepted that valuation as a reasonable form of redress. K Capital, LLC continued to pursue the transaction through the end of the due diligence period while consistently indicating through statements and actions the intent to complete it. Ultimately, K Capital, LLC did not follow through. Plaintiff incurred relatively little direct expense as the result. However, there also is an indirect cost that is not quantifiable. Potentially, Plaintiff could have sold the property to someone else had the listing remained open. In light of the overall circumstances, the Court does not find $100,000.00 to constitute an unenforceable penalty.

## II.   Promissory Estoppel

Plaintiff raises promissory estoppel as an alternative claim for relief should the Court find that no binding contract existed after the automatic termination. Plaintiff argues that it did not re-list the property because it relied on K Capital, LLC's post-termination statements and actions that the deal would go forward. As redress, Plaintiff asks this Court to enforce that promise and to compel K Capital, LLC to pay it the $100,000.00 sum.

This Court need not determine whether Plaintiff proves the elements of a promissory estoppel claim. The finding that the parties readopted the PSA contract and are bound by its terms

renders the promissory estoppel claim moot. "[U]nder Colorado law, 'recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract.'" *Allred v. Innova Emergency Med. Assocs., PC*, No. 18-cv-03097-DDD-NRN, 2020 WL 3259249, at *5 (D. Colo. June 16, 2020) (citing *Wheat Ridge Urban Renewal Auth. V. Cornerstone Grp. XXII, LLC*, 176 F.3d 737, 741 (Colo. 2007)).

## <u>CONCLUSIONS OF LAW</u>

I.      As the parties explain in their Final Pretrial Order, this Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1332. The citizenship of the parties is diverse (Plaintiff is a citizen of Colorado and Defendants are citizens of Minnesota), and the amount in controversy exceeds $75,000.00.

II.     Venue is proper under 28 U.S.C. § 1391 because Plaintiff is a citizen of Colorado; the property subject of the transaction is located in Colorado; and the disputed actions took place in Colorado.

III.    Because this Court has diversity jurisdiction and because Colorado is the forum state, Colorado substantive law governs the parties' dispute.

IV.     Plaintiff proves by a preponderance of the evidence the elements needed to prevail on its breach of contract claim. First, a valid contract existed between them: the parties readopted the PSA as a binding contract between them after its automatic termination on February 13, 2020. Second, Plaintiff performed its obligations under the contract. Third, Defendant K Capital, LLC did not perform its obligations under the contract when it failed to deposit $100,000.00 in earnest money with the escrow agent by March 16, 2020. Nor did K Capital, LLC cure that default despite being given the opportunity to do so. Fourth, the PSA permits Plaintiff to recover $100,000.00 in

liquidated damages, an amount which the evidence shows to be neither punitive nor excessive, as the consequent for Defendant's uncured default and breach of contract.

V.      Because Plaintiff prevails on its breach of contract claim, its alternative claim of promissory estoppel fails as a matter of law.

VI.     Plaintiff brings both its breach of contract and promissory estoppel claims against only Defendant K Capital, LLC. As such, Plaintiff prevails on no claim for relief against Defendant Mikhail Kaminski.

VII.    As the prevailing party on its breach of contract claim, Section 9.9 of the PSA entitles Plaintiff to an award of reasonable attorney fees and expenses against Defendant K Capital, LLC.

## CONCLUSION

The Clerk of Court shall enter Final Judgment in Plaintiff's favor in the total amount of $100,000.00 in liquidated damages on its breach of contract claim. The Clerk of Court shall enter Final Judgment in Defendant's favor on Plaintiff's promissory estoppel claim.

Plaintiff shall file a motion for determination of the amount of that reasonable attorney fee and expense award in compliance with Fed. R. Civ. P. 54(d)(2) and D.C.COLO.LCivR 54.3 on or before **August 26, 2022**.

The Clerk of Court shall close this civil action.

SO ORDERED.

Dated at Denver, Colorado, this 29th day of July, 2022.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge